[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 280 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 281 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 282 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 283 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 284 
This is an action by the plaintiff seeking (1) discovery and accounting for the operation and management by the defendant of a certain pier situate in the City of Camden, New Jersey, which will hereafter be referred to as the *Page 285 
Spruce Street Pier, and incidental thereto, to charge defendant with dereliction of its duties as an agent; (2) to have an agreement entered into between the plaintiff and defendant, dated June 28, 1928, declared ultra vires, illegal and void, and to obtain a judgment for the full amount of the sums thus far advanced under said agreement, regardless of whether held valid or invalid, and (3) seeking to obtain an order directing the defendant to determine and report the proportion of benefit which accrued from the construction of a pier hereafter referred to as the Beckett Street Pier, to each county or municipality within the South Jersey Port District, and to require such counties and municipalities to pay the respective and proportionate shares thus found.
The defendant denies the several claims of the plaintiff and demands as affirmative relief a judgment against the plaintiff for a breach of the contract dated June 6, 1928, in a sum allegedly due under the terms of said contract to date, but unpaid.
The facts in connection with this litigation may be generally stated as follows:
P.L. 1926, c. 336 (R.S. 12:11-1, et seq.), created the South Jersey Port District, comprising the counties of Mercer, Burlington, Camden, Gloucester, Salem, Cumberland and Cape May, and declared the same to be "a public corporation and body politic." As a governing body of said District, the act created a commission to be known as the South Jersey Port Commission. This act, generally stated, granted the commission power and authority over the survey, development, control and operation of port facilities in the district and the coordination of the same. It as well granted it power and authority to acquire real property and to construct such port facilities as it might deem necessary.
As originally designed, the act provided for the payment of construction charges in the following manner: Whenever the Port Commission should determine that it should construct any port or transportation facilities, the cost should be estimated on the basis of definite plans and specifications. The Commission should as well determine and report the proportionate *Page 286 
benefit which would accrue from such improvements to each county or municipality within the said district. After public hearing upon these findings the respective counties and municipalities were to be advised of their proportionate share, which sum should then be raised by a tax on all of the taxable property in such county or municipality, but not to exceed in any one year ten cents on each $100 of each taxable property in such county or municipality. The said several counties or municipalities were thereupon required to submit the question of the levy of the tax by referendum. (R.S. 12:11-16 to R.S. 12:11-25, inclusive.)
By P.L. 1928, c. 64 (R.S. 12:11-26 to R.S. 12:11-39) an alternative method of financing such proposed construction was provided. Under this statute, the South Jersey Port Commission was authorized to enter into contracts with any county or municipality in the district, under the terms of which the municipality would agree to finance the construction of the facilities. R.S. 12:11-26, 27 provide as follows:
R.S. 12:11-26. "The commission is hereby authorized to enter into contracts with any county or municipality or several of them within the district and from time to time amend or supplement the same, and any such contract may contain any or all of the following terms and provisions:
"a. An agreement by the commission to undertake any project or projects which it may be authorized to undertake.
"b. An agreement by the county or municipality to appropriate and pay to the commission such sums in such years and at such date or dates in each year, as may be agreed for the purpose of financing such project or projects. Without intending to restrict the broadest construction of the words `financing such project or projects' such words shall include the payment of the cost of construction and reconstruction of any improvement, the acquisition of property, the cost of maintenance, operation and repairs, and the payment of interest and principal of debt incurred for any of said purposes.
"c. An agreement by the commission upon such terms and conditions as may be stated to repay to the county or municipality the amounts paid in pursuance of said contracts or any part thereof, with interest thereon at not exceeding four per cent per annum. This agreement shall be subject to the obligations of the commission to:
"1. Pay or provide for the payment of its indebtedness and the setting apart of moneys therefor according to the terms upon which the indebtedness may be incurred; and *Page 287 
"2. Pay or provide for the payment of all amounts needed for operation, repairs, maintenance, replacements, reserves for such purposes and for improvements and extensions required for the highest efficiency of such project or projects."
R.S. 12:11-27. "No county or municipality shall agree to pay in any one year under any such contract or contracts an amount which shall exceed ten cents on each one hundred dollars of assessed valuation of property subject to taxation in the county or municipality at the date of the contract. This section shall be construed as a limitation on the right to contract and not on the power to levy taxes."
On June 6, 1928 the City of Camden was the owner of and operating property commonly referred to as the Spruce Street Pier. On that date the plaintiff entered into a contract with the defendant under the last above referred to statute, the terms of which said contract, in brief, provided an agreement on the part of the defendant to "build, construct, maintain, operate, equip and repair within the City of Camden, a marine or port terminal, together with all the necessary wharves, docks, buildings, roadways, railroad tracks and all other construction for the proper operation of said marine or port terminal." Then followed a description of the exact land upon which said port facility was to be constructed, and reference to the plans and specifications already prepared, with a general description of the facilities thereon. The City of Camden further agreed as follows:
"The City agrees to appropriate and pay to the Port Commission for the purpose of financing said project the following sums in the following years and at the following dates in each year, namely; Sixty-five thousand dollars ($65,000) on the first days of March and September in each of the years 1929 to 1933, both inclusive, and Forty-five thousand dollars ($45,000) on the first day of March, and One hundred and Forty-five thousand dollars ($145,000) on the first day of September in each of the years 1934 to 1973, both inclusive."
The Port Commission further agreed as follows:
"On or before the 31st day of December of each year, the Port Commission shall ascertain the amount of money in its hands, either derived from the payments made to it by the City, as provided by Article II, or derived from the earnings of the project described in Article 1, which are not necessary for the following purposes; namely,
"(a) to pay or provide for the payment of its indebtedness and the setting apart of moneys therefor, according to the terms upon which said indebtedness may be incurred, and *Page 288 
"(b) to pay or provide for the payment of all amounts needed for operation, repairs, maintenance, replacements, reserves for said purpose and for improvements and extensions required for the highest efficiency of such project."
"All moneys which in the uncontrolled discretion of the Port Commission are then in its hands and are not required for the said purposes shall on or before said 31st day of December be paid by the said Port Commission to the City until the total amount so paid shall equal the amounts paid by the City to the Port Commission with interest thereon at the rate of four per centum per annum. The amounts so paid shall first be applied to the payment of interest and the balance thereof shall be applied to the payment of the principal."
The City of Camden further agreed, by Article IV, paragraph 3, as follows:
"The City covenants with the Port District and with the holders of the bonds of the Port District proposed to be issued, that it will insert the amount of the payments required by this contract in its annual budget and unless moneys are available from other source, will raise by tax in each year an amount sufficient to make said payments."
The defendant did thereupon sell its bonds and with the proceeds constructed the Beckett Street Pier.
Thereafter, and more particularly on June 28, 1928, the City of Camden adopted the following resolution referring to the Spruce Street Pier, which was then owned and had been operated for some time by it:
"Whereas, the City of Camden has assumed control of the Spruce Street Pier, the Board of Commissioners of the City of Camden, hereby appoints the South Jersey Port Commission as Operating Agent of said pier and yard, the City receiving all Revenue and bearing all expenses in connection therewith;
"Therefore, be it resolved, by the Board of Commissioners of the City of Camden, N.J., that said pier be placed under the jurisdiction of the Department of Revenue and Finance, as a public enterprise, and that there be appropriated from the revenues of said pier sufficient funds to operate the same, and that the proper officers of the City are hereby authorized to borrow in anticipation of said revenue, return any surplus to the City Treasury, and provide for any deficit in subsequent budgets of the City.
"And be it further resolved, that a contract be entered into between the City and the Port Commission concerning the operation thereof and the proper officers of the City of Camden be and are hereby authorized to sign and execute same in behalf of the City of Camden." *Page 289 
On June 1, 1931 the city entered into a formal contract with the South Jersey Port District in further pursuance of the resolution of June 28, 1928. This agreement reads as follows:
"This agreement made and entered into this first day of June, 1931, between the South Jersey Port District, hereinafter referred to as the `Port District', a public corporation and body politic of the State of New Jersey, party of the first part, and the City of Camden, hereinafter referred to as `City', a municipal corporation of the State of New Jersey, party of the second part, witnesseth:
"Whereas, on the sixth day of June, 1928, an agreement was entered into by and between the parties hereto for the acquisition of land and the constructing, maintaining, operating, equipping and repairing, with the `City', of a marine or port terminal, together with all the necessary wharves, docks, buildings, roadway, railroad tracks and all other construction, for the proper operation of said marine or port terminal, more particularly set forth and described in said contract above referred to and a copy of which contract is attached hereto and made a part hereof and marked Exhibit `A', and which said property is now nearing completion, and is about ready for public operation; and,
"Whereas, on the 28th day of June, 1928, a resolution was passed by the `City' authorizing the proper officers of the `City' to enter into and execute a contract on behalf of the said `City' with the said `Port District', the purpose of the last mentioned resolution and the purpose of the said `City' and `Port District' being to authorize the said `Port District' to act as operating agent of property owned by the said `City' and known as the `Municipal Pier Property', and to authorize said `Port District' to fix rates to regulate shipping both in and out of said pier, to arrange for the storage of materials in transit on or in said property; and for the necessary assistants and labor for the proper conduct of such business, and to make regular accountings of said business to the `City' from time to time as may be required by the `City', and otherwise to handle all such business and property in the best interests of the `City' in all respects, in order to avoid any conflict in rules, regulations, operating charges or other elements relating to management or service of both said properties and the business conducted therein and thereon,
"Now, therefore, in consideration of the premises herein the parties hereto agree as follows:
"1. The `City' hereby authorizes and appoints the said `Port District', and the said `Port District' hereby agrees, to act as the agent of the `City' in all respects for the purposes and in the manner hereinabove recited with full authority in said `Port District' to do any and all things necessary to be done to carry out the intent of said recitals. *Page 290 
"2. Said `Municipal Pier Property' shall be under the jurisdiction of the Department of Revenue and Finance of the City, as a public municipal enterprise.
"3. This contract shall continue in force and the `Port District' shall exercise its authority hereunder, continuously, unless and until terminated by mutual agreement; provided, however, shall the said `Port District' be divested of the powers conferred upon it by the existing laws of the State of New Jersey, or be merged into or be supplanted by any other commission or agency of the State, or should said `Port District' lease or otherwise dispose of the property first herein referred to, or should said `Port District' be unable for any reason, to continue to carry on the operation of the said property first herein referred to, then and in that event this agreement and the authority conferred by it upon said `Port District' shall automatically cease and terminate.
"In witness whereof, the South Jersey Port District, acting by the South Jersey Port Commission, and the City of Camden, have caused this agreement to be executed by their duly authorized officers the day and year first above mentioned."
In pursuance of the said resolution and agreement of June 1, 1931, the defendant has been operating the Spruce Street Pier since June 28, 1928.
On September 1, 1946 the sum of $145,000 became due under the contract of June 6, 1928, but plaintiff refused payment thereof. This precipitated an action by defendant in the then New Jersey Supreme Court which, upon the filing of plaintiff's present suit in the then Court of Chancery, was enjoined. Subsequently the Supreme Court action was discontinued and defendant filed its answer and counterclaim in the Chancery suit.
Therefore, it is to be noted that the defendant operates two piers, (1) the Spruce Street Pier by reason of the resolution of June 28, 1928 and the contract of June 1, 1931, and (2) the Beckett Street Pier, which it not only operates but owns as well.
The first complaint of the City of Camden to the conduct of the Spruce Street Pier is that the defendant has reserved certain funds for repairs to the Spruce Street Pier without the authority of the city; that since the plaintiff has refused further payments under the contract of June 6, 1928, the defendant has illegally set off these reserve funds against the moneys so allegedly due it; that the income from *Page 291 
both piers has been commingled; that defendant breached the duty owed plaintiff by itself conducting a competing business at the Beckett Street Pier, and that the defendant has violated its duty as an agent by directing an undue amount of business to the Beckett Street Pier.
The defendant states, among other things, that it is not the agent of the plaintiff in connection with the Spruce Street property, but that it is an "independent contractor."
In order to ascertain the respective legal positions of these charges, it becomes necessary to further particularly examine the pertinent statutes, agreements and facts. R.S. 12:11-13 provides as follows:
"Any municipality within the district may set aside and devote any property owned by it and which is suitable for port facilities to the uses and control of the commission, provided the legislative body of the municipality shall, by a majority vote of all its members, give consent to such use and control and prescribe the terms and conditions upon which the same shall be held."
It is clear, therefore, that since the source of R.S. 12:11-13 is P.L. 1926, c. 336, that at the time the resolution of June 28, 1928 was adopted, the plaintiff had the authority to "set aside and devote" the Spruce Street Pier "to the uses and control" of the defendant. It had as well this authority on June 1, 1931.
On May 14, 1931, in accordance with the statutory mandate, the city had adopted an ordinance authorizing the execution of said agreement.
By authority of R.S. 12:11-7 the defendant was granted the following powers:
"Acquire real property. d. Lease, erect, construct, make, equip, and maintain port facilities in the district and for any such purpose to acquire real property, including easements therein, lands under water and riparian rights by agreement with the owners;
"Regulate construction and operation. e. Regulate and supervise the construction and operation of all port facilities by whomsoever constructed, installed or owned."
The agreement of June 1, 1931 did not contemplate a leasing or an erection and construction of a port facility. What that agreement did do was to provide for the regulation and *Page 292 
supervision of the operation of a port facility. To all intents and purposes, insofar as the operation of the Spruce Street Pier was concerned, the defendant was the alter ego of the city. It is to be remembered that at the time the agreement concerning the Spruce Street Pier was executed, the defendant had already undertaken the construction of the Beckett Street Pier, which was then nearing completion, not only with the knowledge of the plaintiff but as well with active participation of the plaintiff, as was evidenced by the adoption of the agreement of June 6, 1928, under which the plaintiff agreed to finance the construction of the Beckett Street Pier.
The ordinance adopted on May 14, 1931 demonstrates the purpose of entering into the agreement of June 1, 1931 for the operation of the Spruce Street Pier. It is plain that it was then contemplated that the two piers could be more efficiently operated by one authority or agency, which was, in the language of the ordinance authorizing the contract, "for the best interests of the City and for the public's benefit." The language of the original resolution, the ordinance and the final contract show an intent to turn over to the defendant the actual operation and conduct of the business of the Spruce Street Pier. The very language of this contract designating the defendant "operating agent" of, and "to make regular accountings to the City * * * and otherwise to handle all such business and property in the best interests of the City in all respects, in order to avoid any conflict in rules, regulations, operating charges or other elements relating to management or service of both said properties and the business conducted therein and thereon," shows the intent to avoid the dangers attendant upon the possibility of the two piers acting as competing businesses. In the resolution of June 28, 1928 the intent of the city was expressed in the following phraseology: "the City receiving all revenues and bearing all expenses." This resolution, coupled with the ordinance and final agreement, show an intent to permit the defendant to determine upon the charges to be made for the facilities furnished at the Spruce Street Pier, to pay the *Page 293 
expenses incident thereto, and to pay the balance, after such expenses had been deducted from the revenues, to the City of Camden, without any reserve for maintenance or repair of the pier itself.
This is a limited agency which does not vest the defendant, without further authority from the plaintiff, with the power to reserve funds for the maintenance and repair of the Spruce Street Pier.
The complaint of the plaintiff to the commingling of the revenues of the two piers is presently unimportant. It is at most a matter of bookkeeping. There has been no loss, nor is there any complaint that the funds so held for the plaintiff's account are not available. A better method would undoubtedly have been to have segregated the revenues according to their source, but until any loss has been sustained, this is, at best, an academic question.
Plaintiff has raised some objection to the appropriation of money by the defendant which it held as reserve for capital repairs to the Spruce Street Pier. The plaintiff had heretofore failed and refused to make several of the annual payments called for under the contract of June 6, 1928. The defendant thereupon appropriated on account of this alleged indebtedness moneys then in its hands received from the operation of the Spruce Street Pier and reserved for the above purpose.
Generally, a right to set-off or counterclaim may be available to an agent in an action brought against him by the principal.Restatement of the Law, Agency, page 965; Evans v. City ofTrenton, 24 N.J. Law 764. In view of the fact that this action was in the nature of a complaint seeking a rescission and accounting, there is no reason that this court may not judge the counterclaim of the defendant in order to give complete relief and allow the retention of the amount in defendant's hands against the amount owed by plaintiff. Hutchinson v. VanVoorhis, 54 N.J. Eq. 439; 35 Atl. 371.
The plaintiff has, as noted, alleged that the defendant breached the duty owed plaintiff by itself conducting a competing business at the Beckett Street Pier. *Page 294 
As a general principle, it must be recognized that an agent is subject to a duty not to compete with a principal concerning the subject matter of his agency. Restatement of the Law, Agency,sec. 393, reads as follows:
"There is no violation of the agent's duty if the principal understands that the agent is to compete; a course of dealing between the parties may indicate that this is understood. Likewise, an agent may act freely on his own account in matters not within the field of his agency and in matters in which his interests are not antagonistic to those of the principal, except that he may not properly thus use confidential information."
See also Amer. Jur., vol. 2, sec. 267.
It is plain not only from a chronological recital of the dates when the two contracts between the plaintiff and defendant were executed, i.e., June 28, 1928 and June 1, 1931, but as well from the actual recitals and provisions of the two contracts and the resolution and ordinance above adverted to, that the plaintiff was not only not unaware of the ownership and operation of the Beckett Street Pier by the defendant but that it actually and affirmatively consented thereto. There is, therefore, no breach of any duty owing by the agent to its principal.
The testimony does not sustain plaintiff's contention that defendant sacrificed the business of the Spruce Street Pier for its own benefit in order to obtain a greater return from the Beckett Street Pier. The evidence satisfies me that the reason for the increase in business at the Beckett Street Pier is attributable to the greater and more modern facilities there available, which resulted in a more efficient and economical handling of freight. The defendant attempted to turn business over to the Spruce Street Pier but was in many instances unsuccessful because the consignor or the shipping agent insisted upon the Beckett Street Pier if it were available. The defendant did not attempt to prefer the Beckett Street Pier to the Spruce Street Pier, and did not, therefore, violate any duty owed as an agent of plaintiff.
Plaintiff contends that the contract with the defendant, dated June 6, 1928, is ultra vires, illegal and void. This argument is predicated upon an alleged violation of Article *Page 295 
1, paragraph 19 of the 1844 New Jersey Constitution, which reads as follows:
"No county, city, borough, town, township or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of any stock or bonds of any association or corporation."
and Article 1, paragraph 20 of said Constitution, which reads as follows:
"No donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation whatever."
It is the theory of the plaintiff that the provision in said agreement binding it to make certain annual payments to the defendant is a gift of money or a loan of credit inhibited by the above constitutional provision.
The defendant South Jersey Port District is "a public corporation and a body politic." (R.S. 12:11-2). By P.L.
1926, c. 336, (R.S. 12:11-15 to 25) there was provided one method for financing the construction of port facilities. ByP.L. 1928, c. 64, (R.S. 12:11-26 to 39) there was provided a second alternative method of such financing. The second method was here employed.
The evil at which the constitutional prohibition is directed is clearly stated in the very verbiage of the section, i.e.,
against financial aid to or subsidy of "any individual, association or corporation," or any "donation, etc.," to any "society, association or corporation," or becoming the owner "of any stocks or bonds of any association or corporation."
As stated in Wilentz v. Hendrickson, 133 N.J. Eq. 447
(480); 33 Atl. (2d) 366, even though public funds were to be spent for public purposes, the constitutional sections here in question
"were intended to prevent the accomplishment of that purpose by means of aid to private corporations not constituting public agencies controlled by the state."
Historically, the purpose of the constitutional provision is set forth in Carr v. Merchantville, 102 N.J. Law 553, atpage 556; 142 Atl. 1: *Page 296 
"The reason why those sections were put into the constitution as amended in 1875 was because of a practice that had grown up very largely in the west in the furtherance of aid to railroads and other private corporations, which, of course, were corporations, it is true, in most instances, affecting the public interest."
In Romano v. Housing Authority, Newark, 123 N.J. Law 428;10 Atl. (2d) 181, the court said at page 433:
"The statute although it may in effect provide for the extension of money or credit to the Housing Authority, does not thereby violate the provisions of the State Constitution prohibiting the appropriation of money to or for the use of any society, association or corporation; because whatever moneys or credits extend to the Housing Authority, directly or by way of exemption from taxation or otherwise, are no more than an indirect appropriation from the state's general funds for the benefit and support of one of the state's agencies organized to engage in the accomplishment of an important public work."
See also Rutgers College v. Morgan, 70 N.J. Law 460;57 Atl. 250; Trustees, c. v. Civil Service Commission,83 N.J. Law 196; 83 Atl. 980.
The Legislature saw fit to grant to municipalities generally, as an item contributing to the public good, welfare or prosperity, the right to construct docks and wharves. (R.S.
40:68-1 et seq., R.S. 40:179-1 et seq.). For the accomplishment of this purpose it delegated the power to construct and operate piers, with the consent of plaintiff municipality, to the defendant. (R.S. 12:11-26 et seq.).
In Jersey City v. Martin, 126 N.J. Law 353;19 Atl. (2d) 40, the court said at page 361:
"A municipality is merely a political subdivision or department of the state. It is an agency created for the exercise, within the prescribed limits, of the governmental functions and powers of the state. It is but the creature of the state, and exists at its pleasure."
The defendant may, for present purposes, be considered a branch or agency of the plaintiff. The situation is comparable to that considered in Trustees, c. v. Civil Service Commission, supra,
where the court said, at page 203:
"To justify the donations of public moneys, it seems necessary to regard these organizations as public agencies of the state, created by it in connection with its municipalities and as an incidental part of their government. *Page 297 
"In Rutgers College v. Morgan, Comptroller, 41 Vroom 460 (atp. 473), it was held that the constitution `does not bar instrumentalities for public education provided by the state and under its control by general laws, where the appropriation is made for such schools. * * * They were not intended to narrow or circumscribe the legislative power to furnish facilities by general laws for public education under its own supervision.'"
"Although the legislature saw fit, for its convenience and for purposes of the administration of this branch of its educational duty, as now constituted under its public policy, to create a corporation, will not prevent such corporation from being considered a mere branch or agency for that special purpose.Hirsch v. Burk, [83 N.J.L. 146]. See also 1 Dill. Mun. Corp.(ed. 1911) 696."
The Legislature is primarily the judge of the law, and every possible presumption in favor of its validity will be indulged. It will not be declared void unless its repugnancy to a constitutional limitation is so manifest as to leave no room for reasonable doubt. In Mansfield Swett, Inc. v. West Orange,120 N.J. Law 145; 192 Atl. 225, the court said, at page
157:
"It will not be declared void unless its repugnancy to a constitutional limitation is so manifest as to leave no room for reasonable doubt. A legislative enactment should not be set aside unless its unconstitutionality indisputably appears. State Boardof Milk Control v. Newark Milk Co., supra [118 N.J. Eq. 504];State v. Murzda, 116 N.J.L. 219."
Plaintiff has advanced the further arguments, to demonstrate that the construction and operation of the Beckett Street Pier is inhibited by the above constitutional sections, that such functions are proprietary rather than governmental, and the failure to realize any financial benefit from the pier because it did not show a direct profit through operation.
Public Service Electric, c., Co. v. Camden,118 N.J. Law 245; 192 Atl. 222, answers the former, at pages 251 and 255:
"A municipality is an agency of the state for the administration, within the prescribed limits, of the governmental functions and powers of the state. Trenton v. New Jersey, 262 U.S. 182;43 S.Ct. 534; 67 L.Ed. 937. Such is its governmental aspect. In its strictly municipal character, it administers local self-government, subordinate to the state, for the regulation of the purely domestic concerns of its inhabitants. In this capacity, it functions not as sovereign, but in the proprietary sense. The legislature is likewise the exclusive source of that authority. Of this more hereafter. The *Page 298 
line of separation between its public or governmental and private or proprietary functions is ofttimes obscure; they are frequently so blended as to be indistinguishable. And, for the purposes of legislation, they are ordinarily grouped under one general head, and considered as relating to a single object; the constitution does not regard them as two separate and distinct subjects — so incongruous as to be incapable of treatment in a single enactment."
The Legislature saw fit to declare that the construction, etc., of piers or wharves was for a public purpose and therefore in the public interest. In furtherance of this purpose it saw fit to create a subservient agency or board to which it delegated the power to accomplish the purpose granted to municipalities. The happenstance that the conduct of the wharf or pier did not show a direct profitable financial return to plaintiff does not in and of itself demonstrate that it was not endowed with a benefit to the public. This is not in and of itself a test. The benefit may be indirect. On the other hand, the purpose cannot be held not to have been a benefit at the time undertaken because it is seen in retrospect not to have been directly financially successful.
Both the plaintiff and defendant are political subdivisions or departments of the State, existing at the pleasure of the State. The Legislature had the power to authorize the plaintiff to construct and operate the pier and as well had the power to empower another public body or agency to so do, on plaintiff's behalf, with plaintiff's consent and with plaintiff's financial assistance.
Since the appropriation of money agreed to be made annually by plaintiff and paid to defendant is a payment to a public body or agency for a public purpose, the Legislature had full power and authority to authorize a contract such as here present. The contract is neither ultra vires nor unconstitutional.
The plaintiff also contends that under the terms of the agreement of June 6, 1928 the money which it had heretofore advanced is all presently due and owing and demands a judgment therefor. This contention finds its foundation in the allegation of the plaintiff that the monies advanced by it were a loan without specified due date, or that the due *Page 299 
date shall be determined solely by the debtor. In this situation it is argued that the court supplies the deficiency of a certain due date by reading into the contract a provision that the money shall be due within a reasonable time after it is advanced. It must be conceded at the outset that ordinarily where there are acts to be performed by one party to a contract and the promise to perform such acts fixes no time for their completion, a reasonable time is intended. It is undoubtedly the law that where no time for payment is expressed in a promissory note or other instrument for the payment of money, the law adjudges that the parties meant that the money should be payable immediately.Agens v. Agens, 50 N.J. Eq. 566; 25 Atl. 707. In such a case it is necessary first to interpret the promise in the light of all the surrounding circumstances, and with reference to its subject-matter, in order to ascertain the intention of the parties. 1 Williston on Contracts, page 101.
Under the circumstances of the case here present and upon a consideration of the circumstances surrounding the execution of the contract, it is found that there was a definite time for the repayment of the sums advanced by the plaintiff. For a clear understanding of the circumstances, it must be remembered that at the time the contract of June 6, 1928 was executed the plaintiff was quite patently desirous of having a pier constructed in the City of Camden, having determined that the same was for the public benefit. To construct this pier required an expenditure of more money than the defendant then had available. The defendant issued and sold its bonds for such construction, predicated upon the contract of June 6, 1928, under which the plaintiff promised to advance money in definite annual installments over a period of years. The contractual obligation of the plaintiff was in the nature of collateral security to the purchasers of the bonds for the repayment of the monies advanced by it, and as well, of course, under the terms of the contract and the applicable statute, to some extent a fund to be used for the operation and maintenance of the pier. *Page 300 
At the date of this contract there were two methods available to the defendant for the financing of its projected undertaking: (1) by the contribution from various municipalities and counties within the South Jersey Port District, (R.S. 12:11-1 to R.S.
12:11-25). The several contributions under this statute were in the nature of an assessment for benefits, being proportioned among the individual counties and municipalities to the extent of the benefits derived by them from the construction of the pier; (2) by a specific contract under which a single county or municipality was authorized to finance the construction, (R.S.
12:11-26 to R.S. 12:11-39). Both the plaintiff and the defendant undertook to proceed under the latter of the above quoted statutes. After making provision for the agreement to construct the pier and the agreement to repay the monies so advanced by a municipality, R.S. 12:11-26 made the following provision:
"c. An agreement by the commission upon such terms and conditions as may be stated to repay to the county or municipality the amounts paid in pursuance of said contracts or any part thereof, with interest thereon at not exceeding four per cent per annum. This agreement shall be subject to the obligations of the commission to:
"1. Pay or provide for the payment of its indebtedness and the setting apart of moneys therefor according to the terms upon which the indebtedness may be incurred; and
"2. Pay or provide for the payment of all amounts needed for operation, repairs, maintenance, replacements, reserves for such purposes and for improvements and extensions required for the highest efficiency of such project or projects."
The agreement of June 6, 1928, to some extent paraphrasing the language of the foregoing statute, provided in Article III as follows:
"1. On or before the 31st day of December of each year, the Port Commission shall ascertain the amount of money in its hands, either derived from the payments made to it by the City, as provided by Article II, or derived from the earnings of the project described in Article I, which are not necessary for the following purposes, namely,
"(a) To pay or provide for the payment of its indebtedness and the setting apart of moneys therefor, according to the terms upon which said indebtedness may be incurred, and *Page 301 
"(b) To pay or provide for the payment of all amounts needed for operation, repairs, maintenance, replacements, reserves for said purpose and for improvements and extensions required for the highest efficiency of such project.
"2. All moneys which in the uncontrolled discretion of the Port Commission are then in its hands and are not required for said purposes shall on or before said 31st day of December be paid by the said Port Commission to the City until the total amount so paid shall equal the amounts paid by the City to the Port Commission with interest thereon at the rate of four per centum per annum. The amounts so paid shall first be applied to the payment of interest and the balance thereof shall be applied to the payment of the principal."
The gist of this contract is an agreement by the plaintiff to advance sums from time to time so that the defendant may, in the first instance, by using this agreement to so advance specific funds annually, borrow sufficient money to immediately undertake the construction of a pier.
There is a definite agreement that the defendant shall repay the monies so advanced. The agreement to repay set as a time for such repayment December 31st of each year after the execution of the contract. The monies so advanced during that year become then immediately due. This contemplates as well that the amount due shall be cumulative by adding the sum so advanced in any year to the sums theretofore due and not theretofore repaid. There is a distinction, however, between the date upon which the sums become due and owing and the date when they are payable or payment of such sums may be demanded.
We do not have here present a contract under the terms of which there is no date set for repayment, but we have rather a conditional promise to repay comparable to the promise normally found where a debtor agrees to pay "when able." In this latter event, in order for the creditor to succeed he must allege and prove the ability of the debtor to pay in accordance with the terms of the contract. 12 Amer. Jur. 858.
There is a very clear distinction between these cases where there is no time whatsoever set for payment and cases where the time is qualified or conditioned upon the happening of a specific event. In Parker v. Butterworth, 46 N.J. Law 244, the court said, at page 248: *Page 302 
"That paragraph is in these words: `It would be impossible for me to pay the note at this time; therefore I shall be a thousand times obliged to thee if thee will allow it to rest until John or I, or both, are in better condition to liquidate it.' It is clear that there is not in these words an unqualified promise to pay immediately or on request. The preceding paragraphs of the letter identify the note sued on as that to which the correspondence related, and contain an admission by the defendant that he signed the note as surety for Woodward. Taken in connection with the defendant's admission that he signed the note, and his declaration of his present inability to pay, I think the words quoted are sufficient to warrant the implication of a qualified promise by the defendant to pay when his circumstances had so improved that he had the ability to pay. To make such a promise available the plaintiff was bound to furnish affirmative proof of the substantial fulfilment of the condition (Tanner v. Smart [6B. C. 603], Haydon v. Williams [7 Bing. 163], supra;scales v. Jacob, 3 Bing. 638; Ayton v. Bolt, 4 Id. 105;Edmunds v. Downs, 2 C. M. 459; Meyerhoff v. Froehlich;
4 C.P. Div. 63; Tompkins v. Brown, 1 Denio, 247; Wood onLimitations, sec. 77); and of that there was no evidence. The verdict cannot be sustained on the new promise of the defendant."
A conditional promise is a sufficient consideration for a contract. Williston on Contracts, vol. 1, 346 to 349.
It becomes necessary here to determine exactly what the defendant agreed to do in connection with repayment.
There is an express provision in the statute that the defendant shall repay the monies advanced to it after the payment or provision for the payment of its own indebtedness and for the payment of sums needed for operation, repairs, maintenance, replacements and reserves required for the pier. The statute provides, as will be noted, that such repayment shall be "upon such terms and conditions as may be stated." The terms as stated in the agreement are that the above advances shall be repaid annually on or before December 31st of each year, after making the necessary deductions to comply with the statutory requirement, from funds in the hands of the defendant, either derived from payment by the plaintiff or by earnings from the pier.
Apparently the plaintiff complains particularly because of the provision in the agreement that the defendant shall, in its "uncontrolled discretion" determine what monies are necessary to be reserved by it for the statutory purposes. There is no allegation, nor is there any proof that the funds *Page 303 
thus far reserved by the defendant were capriciously, fraudulently or unreasonably reserved by it and that these funds as so deducted for the above purposes were not necessary for such purposes. It follows, of course, that the defendant may not, either under the statute or under the agreement, arbitrarily refuse to repay the monies advanced to it by the plaintiff. Its discretion is subject to being reasonably and honestly exercised.
In Weinstein v. Sheer, 98 N.J. Law 511; 120 Atl. 679, the court said at page 512 and 513:
"The rule is indubitable that where parties by written contract have freely chosen their own unambiguous verbal formula, to define their rights and duties, they are bound by the plain terms of their contract; and the court cannot in the absence of fraud or like recognized equitable ground, reconstruct the contract, for the purpose of making its terms accord with a post contractual conception more suitable to the situation of the parties. Chancellor Kent sums up the doctrine in the statement that we are obliged to give to the language used: `Its just sense and to search for the precise meaning; and one requisite is to give due effect to the contract without adopting either the rule of a rigid or of an indulgent construction.' 2 Kent Com. 556.
"The moral rule as laid down by Dr. Paley is also the accepted rule of law and equity, as well as the law of nations: `To give to the contract the sense in which the person making the promise believed the other party to have accepted it.' 2 Kent Com.
557."
"The delimitation of time by judicial construction for the performance of an act within a reasonable time, arises in those cases where no time is specified for the performance of an act; or where by reason of the peculiarity of the transaction, the parties ex necessitate have been held to have so contracted. 6R.C.L. 946, and cases.
"Where the contract expressly provides for its execution within a specific time, the instrument evidencing the plain will of the parties necessarily controls and obviates any attempt at judicial interpretation; for as was stated by Chief Justice Beasley inDouglass v. Freeholders, 38 N.J.L. 214, regarding the language of a statute: `When words of a statute and their meaning are clear, and they are not rendered dubious by the context, they cannot be controlled by judicial construction.' The same rule is applicable to contracts. 6 R.C.L. 837, and cases; Delamater v.Miller, 1 Cow (N.Y.) 75; Drew v. Ellison, 60 Vt. 401;Ruderow v. State, 31 N.J.L. 515; Kupfersmith v. DelawareInsurance Co., 84 Id. 275."
Cases cited by the plaintiff are not applicable to the present situation. *Page 304 
In Green v. Richards, 23 N.J. Eq. 32, there was present in the agreement no provision for any time at which or within which the mortgage there under consideration was payable. The court there said that it would presume to have been the intention of the parties that the mortgage should be made payable on demand.
In Glazer v. Klughaupt, 116 N.J. Law 507; 185 Atl. 8, the court said at page 509:
"It is averred, in substance, that payment of the retained portion of appellant's weekly earnings was, by express stipulation, postponed until the happening of a contingency, i.e., the performance of the marriage contract. There being no provision for a definite time, the law presumes that it was the intention of the parties that the contingency upon which the payment of the accumulated earnings depended would happen within a reasonable time. This is an implied term of the contract. Otherwise, if the occurrence of the contingency were within the employer's control, as is the case here, he might, of his own volition, so postpone the time as to deprive the employe of his right of action; and this would, ordinarily, do violence to the intention of the parties. See Wolf v. Marsh, 54 Cal. 228;Hood v. Hampton Plains Exploration Co., 106 Fed. Rep. 408."
The repayment sub judice is not so within defendant's control that it might of its own volition so postpone the time of repayment as to deprive plaintiff of its right of action. Therefore, it is here held that the contract expresses by its own verbiage a plain and unambiguous formula for the ascertainment of the time when the money advanced by the plaintiff should be paid. It is further held that the money advanced by the plaintiff is a loan or advance to be paid by the defendant as and when it is able to make such repayment. The ability of the defendant to repay is to be ascertained by the use of the formula provided in Article III of the contract. Such reservations as the defendant may make for the purposes set forth in Article III must not be capricious, fraudulent or unreasonable. The defendant has no uncontrolled discretion about the repayment of the loan, but must be governed as above set forth.
Plaintiff further argues that the defendant is required to determine and report the proportionate benefits which have accrued from the construction of its pier to each county *Page 305 
and municipality in the South Jersey Port District, and to compel the said counties and municipalities to pay their respective and proportionate shares of such benefits. The answer to this argument finds its foundation in the fact that the construction of the pier was not financed under P.L. 1926, c. 336 (R.S.
12:11-15 to R.S. 12:11-25) but was financed under P.L.
1928, c. 64 (R.S. 12:11-26 to R.S. 12:11-39). There is no provision for any such determination under the latter statute. At the time the agreement of June 6, 1928 was entered into there were two distinct and separate methods of financing, either of which the defendant might have adopted for the construction of its pier. The parties undertook to proceed by the latter method and by the terms of the statute and the agreement thereby authorized, the liability to make the payments was solely that of the plaintiff. No other municipality or county in the District could be obligated to make any payment. Plaintiff is, therefore, solely liable and the defendant will not be ordered to ascertain and assess any benefits among any other municipalities or counties.
Having disposed of plaintiff's contentions, it becomes necessary to consider defendant's counterclaim.
Plaintiff took some exception to the jurisdiction of this court to grant the relief which the defendant seeks by way of a money judgment for plaintiff's failure to make the payments as required by the agreement of June 6, 1928. Plaintiff conceives that the counter-suit must be either a suit for damages or specific performance.
Under the Constitution of 1947, express provision was made for the Law Division and the Chancery Division of the Superior Court to exercise the powers and functions of the other division.Article VI, Section III, paragraph 4 reads as follows:
"Subject to the rules of the Supreme Court, the Law Division and the Chancery Division shall exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief shall be granted in any cause so that all matters in controversy between the parties may be completely determined."
It must be now conceded that where the primary right of the plaintiff or the principal relief sought by plaintiff *Page 306 
is equitable, the action must be brought in the Chancery Division, but that legal relief may as well, in addition thereto, be obtained in that division. Superior Court Rules 3:40-2.
Superior Court Rules 3:18-1 provides as follows:
"Joinder of Claims. The plaintiff in his complaint or in a reply setting forth a counterclaim and the defendant in an answer setting forth a counterclaim may join either as independent or as alternate claims as many claims either legal or equitable or both as he may have against an opposing party. There may be a like joinder of claims when there are multiple parties if the requirements of Rules 3:19, 3:20 and 3:22 are satisfied. There may be a like joinder of crossclaims or third-party claims if the requirements of Rules 3:13 and 3:14 respectively are satisfied."
That there was under the Constitution of 1844 a restriction on the right of the Court of Chancery to award unliquidated money damages in an action brought before it must be conceded. In TheL. Martin Co. v. L. Martin Wilckes Co., 75 N.J. Eq. 257;72 Atl. 294, the Court of Errors and Appeals said, at page 259:
"We are not prepared to accede to his suggestion that we should so extend the jurisdiction of a court of equity, however desirable it may be that such extension should be brought about, either by legislation, or, if that is impossible, in view of our constitutional limitations, by constitutional amendment.
 * * *
"There is a class of cases in which a court of equity will ascertain the amount of compensation, but these are cases where the ascertainment is necessary as a condition precedent to the equitable relief which the court of chancery is competent to afford."
For the power of the late Court of Chancery to ascertain the amount of compensation required from a defendant, see Benton Holden, Inc. v. Central R.R. Co. of N.J., 122 N.J. Eq. 309;194 Atl. 805.
We are not presently concerned with the limitations of the 1844 Constitution, but rather with the accomplishment of the suggestion made in the above cited case, as evidenced by the 1947 Constitution. The then existing constitutional limitation has now been changed so that in furtherance of granting complete relief whenever the ends of justice require it, the Chancery Division of the Superior Court may try and determine not only the primary equitable cause of action, but a legal *Page 307 
cause of action as well, whether by way of complaint or counterclaim.
The ascertainment of defendant's damages is a simple arithmetic computation. To grant complete relief the liquidated damages as well may be determined by the Chancery Division. The form of the action is not the important feature. What is of moment is whether the ends of justice require that all matters in controversy between the parties be completely determined. It is plain that to finally dispose of the matters in difference between the parties it is vital that this problem be solved. To now refuse would result only in a relegation of the defendant to the Law Division of the Superior Court for an affirmative suit for damages. Therefore, whether we consider the defendant's claim in the nature of a counter-suit for damages or as a counterclaim as part of the accounting prayed for by the plaintiff, defendant is entitled to a judgment for the money which plaintiff has thus far failed to advance.
An examination of the opinion of the late Vice-Chancellor Woodruff in this matter, upon plaintiff's application for a preliminary injunction restraining the defendant from proceeding with a suit at law heretofore commenced for the recovery of damages in the amount of the money that plaintiff had agreed by the contract dated June 28, 1928 to advance to defendant but had refused to pay, discloses the following:
"In view of what I understand to be the admission herein, by the City, that it owes the Commission the sum of $145,000, under the contract of June 6, 1928 (for which the Commission sued at law), it would serve no purpose to require the City to submit to a law judgment. Therefore, I incline to the second alternative — that of enjoining the law suit — but, if I am correct as to the admission, I shall do so only on condition that the indebtedness and its amount be settled now. On the other hand, if the amount due under the contract is in dispute, I shall permit the law suit to proceed so that a jury can assess the damages. A formal admission, or other appropriate pleading, may be filed if an Order for a preliminary injunction is presented."
There does not appear in the file "a formal admission or other appropriate pleading." However, the preliminary restraint was granted upon the condition precedent that such admission should be made. Although such formal *Page 308 
admission is absent from the file, as above suggested, we must consider that plaintiff agreed thereto from the very granting of the restraint and the unequivocal acceptance thereof by plaintiff. It is a late hour now to question the mandatory condition upon which the restraint was granted.
The counterclaim here is such as the late court of chancery had jurisdiction to determine. Especially under our present constitution and rules has this court such authority.
Judgment will be entered as above noted.