LOUIS B. TIM, PROSECUTOR-APPELLANT, v. CITY OF LONG
  BRANCH, A MUNICIPAL CORPORATION, GEORGE
  NORTHAM, BUILDING INSPECTOR OF THE CITY OF
  LONG BRANCH, FRANCIS M. BAXTER, FRANK MILLER,
  FRANK NEWCOMB, JOHN T. BRITTON, Jr., HARRY
  CHASEY, CONSTITUTING THE BOARD OF ADJUST-
  MENT OF THE CITY OF LONG BRANCH, ADELE TROUN-
  STINE, JAMES SUTHERLAND, INC., A BODY CORPO-
  RATE, AND NATIONAL HOUSING AGENCY, AN AGENCY
  OF THE UNITED STATES OF AMERICA, RESPONDENTS-
  RESPONDENTS.

Argued February 4, 1947—Decided May 15, 1947.

For the prosecutor-appellant, *Parsons, Labrecque, Canzona & Combs* (*Theodore D. Parsons,* of counsel).

For the respondents-respondents, *Quinn, Doremus, McCue & Russell* (*DeVoe Tomlinson* and *John J. Quinn,* of counsel), for Adele Trounstine; *Edgar H. Rossbach* and *Roger M. Yancey* (*John F. Sonnett* and *Marvin C. Taylor,* of counsel), for the National Housing Agency.

The opinion of the court was delivered by

WACHENFELD, J. This is a zoning case in which the issue is whether the United States Government had the right to convert a leased residence into an apartment in violation of the zoning ordinance of the City of Long Branch.

Adele Trounstine for a number of years owned a large dwelling house in the City of Long Branch on the east side of Westwood Avenue, running up to Bath Avenue. In December, 1942, it was determined by the President of the United States that there existed in the City of Long Branch, New Jersey, an acute shortage of housing for persons engaged in national-defense activities which impeded national-defense efforts and that such housing would not be provided by private capital. Accordingly, the United States, acting through the National Housing Agency, in order to help ease the housing shortage in the area, started negotiations with Mrs. Trounstine for the lease of her property, with the right to alter the structure so as to provide a number of apartments.

Various plans for the alterations were prepared. On February 2d, 1943, Mr. Trounstine submitted to the building inspector penciled sketches of the building's conversion to nine apartments prepared by an architect of the Home Owners Loan Corporation. These sketches failed to comply with the municipal ordinance requiring detailed plans and specifications be included with applications for building permits. The building inspector and the Board of Commissioners approved them at that time and the following day the former endorsed his written approval on penciled sketches providing for fifteen apartments and told Mr. Trounstine to go ahead and have the plans prepared. Blueprints dated March 1st, 1943, were prepared by the United States Government architects for fourteen apartments and were sent to the Washington offices of the National Housing Agency and to the Tenement House Commission of the State of New Jersey for approval.

At that time and until March 16th, 1943, the zoning ordinance of the city contained no prohibition against apartment houses in the residential zone herein concerned except that they should contain not less than five apartments. On the latter date an ordinance was enacted by the city which amended the zoning law by limiting to not less than three and not more than six the number of apartments in any apartment house converted from a private dwelling.

In May, 1943, the Trounstines left the dwelling and on the following June 26th a lease was signed between them and

the United States for a term of seven years, including provisions for alterations by the United States Government. A set of the final plans which had been sent for state and federal approval was submitted to the building inspector on July 3d, 1943. About two weeks later the building contractor under contract with the United States Government started the delivery of materials to the premises in preparation for the work and erected a sign thereon. On July 30th the approval of the State Tenement House Commission was received by the contractor and on the same day the building inspector of the City of Long Branch issued a building permit to "James Sutherland, Inc., Contractor, and War Housing—Adele Trounstine, Owner."

The permit was posted on the premises on August 19th, 1943, and on the same date the appellant, through counsel, served the Trounstines and the building contractor with notice of appeal to the Zoning Board of Adjustment. A hearing was then held by the Board, which approved the issuance of the permit but reduced the number of apartments allowed to nine. The Supreme Court allowed *certiorari* and on its own motion included as a party "the National Housing Agency, an agency of the United States of America," which up to that point had not made an appearance. The writ was thereafter dismissed upon the ground "the owner, lessee and contractor acted in good faith upon the belief that the permit was valid and effective, and that prosecutor delayed action too long to be awarded any relief."

We are affirming the court below but for the reasons herein set forth.

The acquisition of this property by the United States Government through its agency, the National Housing Agency, was taken pursuant to the Lanham Act, 42 *U. S. C. A.* 1521, *et seq.* The policy and purpose of the act are, for the duration of the emergency as declared by the President of the United States, to further the national defense by providing "housing for persons engaged in national-defense activities, and their families * * * in those areas or localities in which the President shall find that an acute shortage of housing exists or impends which would impede national-defense

activities and that such housing would not be provided by private capital when needed." 42 *U. S. C. A.* 1521. See, also, 42 *U. S. C. A.* 1524 and 1541.

The Federal Works Administrator (later the National Housing Agency, pursuant to E. O. 9070, 7 *F. R.* 1529) in such case is authorized:

"(a) To acquire * * * improved or unimproved lands or interests in lands by purchase, donation, exchange, lease * * *

"(b) By contract or otherwise (without regard to * * * any Federal, State, or municipal laws, ordinances, rules, or regulations relating to plans and specifications or forms of contract, the approval thereof or the submission of estimates therefor) * * * to make surveys and investigations, plan, design, construct, remodel, extend, repair, or demolish structures, buildings * * * on lands * * * acquired under the provisions of subsection (a) hereof * * *." 42 *U. S. C. A.* 1521.

This lease and the provisions for remodeling are clearly within the scope of those sections. The alterations, however, do not comply with the local zoning ordinance limiting to six the number of apartments in one building.

The question of the necessity of complying with local zoning ordinances is covered by section 1545, which provides in relevant part:

"Consultation shall be had with local public officials and local housing authorities to the end that projects constructed under the provisions of sub-chapters II-IV of this chapter shall, *so far as may be practicable, conform in location* and design *to local planning* and tradition." (Italics added.)

These words would seem to indicate a desire to comply with, but not to be bound inflexibly by, local zoning ordinances. The legislative history of the original act and the subsequent amendment make it entirely clear that the Congressional purpose was to require the Administrator to proceed as considerately as possible but without surrender or qualification of his ultimate authority to proceed in the manner which he might determine to be desirable. 86 *Cong. Rec.,* September 10th, 1940 (at *pp.* 11871, 11872). Attempt was

made during House debate to delete the words "so far as may be practicable" and thereby compel compliance with local planning but the amendment was rejected. 87 *Cong. Rec.,* December 11th, 1941 (at *p.* 9699). Furthermore, the Administrator would not have been given authority to "establish reasonable standards of safety, convenience, and health" by section 1548 if it had been intended by Congress that local regulations were to be controlling.

It is contended that sections 1522 and 1547 compel a contrary conclusion. The former states that "\* \* \* any proceedings for the recovery of possession of any property or project developed or constructed under this subchapter shall be brought by the Administrator in the courts of the States having jurisdiction of such causes and the laws of the States shall be applicable thereto \* \* \*." Clearly, this section does not concern the applicability of zoning ordinances. Section 1547 states:

"Notwithstanding any other provision of law, the acquisition by the Administrator of any real property pursuant to subchapters II-IV shall not deprive any State or political subdivision thereof, including any Territory or possession of the United States, of its civil and criminal jurisdiction in and over such property, or impair the civil rights under the State or local law of the inhabitants on such property."

That section at first blush appears to be contradictory to the above-quoted portion of section 1521 (b) but the contradiction is only apparent and not real. Such an interpretation would render section 1548 unnecessary. Sections 1547 and 1521 (b) are entirely consistent; the former was added to prevent the establishment of an exclusive federal territory or enclave and thereby to preserve such rights as the right to vote and to hold office or any other rights, except where the assertion of state or local jurisdiction might impede or prevent the effectuation of the purpose for which the lands have been acquired by the United States. It was on this basis that the court in *United States* v. *City of Chester,* 144 *Fed. Rep.* (2*d*) 415, held that the Federal Government, acting pursuant to the Lanham Act, was not compelled to comply with state and local building regulations.

The constitutionality of the Lanham Act is also challenged. It is argued that state statutes and municipal ordinances prescribing zoning regulations for the construction of dwelling units and other buildings, being founded in the police power, are entirely within the province of each state and that any attempt on the part of the Federal Government to invade that field of legislation and regulation is beyond the scope of the powers delegated to it by the Federal Constitution.

The argument is untenable. The United States Constitution expressly confers on Congress extensive powers to wage war. Article I, section 8, clauses 11 to 16, inclusive. The legislation enacted pursuant to these powers becomes the supreme law of the land and supersedes state and local laws in contravention thereto. Article VI, United States Constitution. *M'Culloch* v. *Maryland,* 4 *Wheat.* (*U. S.*) 316.

The war powers conferred by the Federal Constitution are not puny powers to be exercised within narrow and restricted fields but are the basis for the very self-preservation of the nation. Measures taken pursuant thereto are presumed to be valid and will not be set aside unless clearly shown to be arbitrary and repugnant to the Constitution. *Highland* v. *Russell Car and Snow Plow Co.,* 279 *U. S.* 253. Their broad scope is indicated by the holding that a curfew on members of a single race is valid in time of war although racial discrimination in other times is abhorrent to our nation and strikes at its very foundation. *Hirabayashi* v. *United States,* 320 *Id.* 81; 87 *L. Ed.* 1774. A nation which in time of war has the power to draft its manpower may certainly contravene rights arising from zoning.

Having determined that the zoning ordinance of the City of Long Branch was not binding on the National Housing Agency, it necessarily follows that the issuance of the permit as approved by the Board of Adjustment was not erroneous.

Judgment affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, BODINE, WACHENFELD, EASTWOOD, WELLS, RAFFERTY, FREUND, McLEAN, JJ. 10.

*For reversal*—DILL, J. 1.

*For modification*—McGEEHAN, J. 1.