12 N.J. Super. 523 (1951)
79 A.2d 897
THE CITY OF NEWARK, A MUNICIPAL CORPORATION OF NEW JERSEY, PLAINTIFF,
v.
NEW JERSEY TURNPIKE AUTHORITY, A CORPORATION OF NEW JERSEY; CONSTRUCTION AGGREGATES CORPORATION, A CORPORATION OF DELAWARE; PETER KIEWIT SONS' CO., A CORPORATION OF NEBRASKA, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 19, 1951.
*526 Mr. Charles Handler, Corporation Counsel, attorney for the plaintiff (Mr. George B. Astley, of counsel).
Mr. Ward J. Herbert, attorney for the defendants.
FRANCIS, J.C.C. (temporarily assigned).
The New Jersey Turnpike Authority was authorized by the Legislature to construct a turnpike across a portion of the State of New Jersey from the New York State line to the Delaware River at Lower Penns Neck Township, Salem County. (N.J.S.A. 27:23-23; L. 1949, c. 41). Pursuant to this authorization, the Authority is now engaged in building the turnpike, a portion of which will run through the City of Newark. The Newark segment, according to the plan, will run from Bound Creek at the Essex-Union County line, generally north to Port Street, where there will be an interchange; then it will run northeasterly to the Passaic River at or near Point No Point, at the Essex-Hudson County line. At Raymond Boulevard, there will be another interchange. These two interchanges are separated by about two miles.
On August 16, 1950, the Authority awarded the contracts for the construction of this portion of the turnpike and the interchanges to Construction Aggregates Corporation and Peter Kiewit Sons' Company. These contracts call for the building of the roadway upon a base of earth.
The City of Newark filed a complaint seeking an injunction to prevent (1) the construction of one of the two interchanges, namely, the one proposed for Raymond Boulevard, and (2) the use of dirt fill in building a 7,100-foot segment of the roadway between the two interchanges.
In attacking these two aspects of the work of the Authority, the complaint charges that the Raymond Boulevard interchange *527 is unnecessary and constitutes an excessive taking of land which is valuable for future development as industrial sites. (Par. 11 (e)). And it charges that the use of dirt fill in this 7,100-foot segment of the roadway is neither practicable nor standard construction; that the standard method of construction is steel structure or reinforced concrete with an open base, designed to preserve all existing public streets and all paper streets set out on the master plan for the future development of the city; and that the use of dirt fill will require a much broader base than a steel or reinforced concrete structure, resulting in an excessive taking of land valuable for potential industrial development. It then alleges that the conduct of the Authority in pursuing the criticized plans constitutes a "palpable abuse of power." (Par. 10.)
The complaint alleges also that, for various reasons, to be discussed herein, the New Jersey Turnpike Authority Act of 1948, as amended (N.J.S.A. 27:23-1), is unconstitutional and that in any event the power conferred thereby with respect to the taking of public streets for turnpike purposes is subordinate to that of the city under the Home Rule Act (R.S. 40:67-1, as amended L. 1947, c. 365, p. 1176).
The Authority has moved for summary judgment in its favor on the pleadings. Voluminous affidavits and exhibits have been submitted on the motion by it and by the city.

I.

THE METHOD OF CONSTRUCTION AND THE INTERCHANGES
Basically the controversy here arises out of the projected use of dirt fill in the 7,100-foot section of the turnpike between the Port Street and the Raymond Boulevard interchanges, and out of the construction of the Raymond Boulevard interchange. It is conceded by the city that no challenge is made to the location of any part of the road. The test to be applied in determining the legality of the action of the Authority in this respect is clearly laid down in the recent case of Mayor, etc., of Elizabeth v. N.J. Turnpike *528 Authority, 7 N.J. Super. 540 (Ch. Div. 1950). There Judge Freund said:
"In the instant case, the Legislature of New Jersey has by statute authorized the construction of the turnpike between two terminal points through designated counties. The Turnpike Authority is an administrative agency acting for the state and is vested with discretion in the selection of the particular route which the proposed turnpike will traverse. When public agencies are vested with discretionary power, a court of equity will not interfere unless there has been a plain and palpable abuse of discretion. A mere difference of opinion is not sufficient to justify the substitution of the court's discretion for that of the duly constituted authority vested by the Legislature."
The application of this test to the present controversy leaves little room for difference of opinion as to the propriety of intervention by the court.
A substantial portion of plaintiff's brief is devoted to a discussion of the many cases wherein it has been declared that a motion for summary judgment should not be granted where the affidavits present a factual controversy on the material issues in the action. (Cross v. Margolis, 136 N.J.L. 453 (Sup. Ct. 1948); Lipari v. Hudson County, 135 N.J.L. 359 (Sup. Ct. 1947); Berger v. Interstate Building and Loan Assn., 121 N.J.L. 507 (E. & A. 1939); Kaplan v. Catlett, 121 N.J.L. 201 (E. & A. 1938); Datz v. Barry, 115 N.J. Eq. 84, pp. 86, 87 (E. & A. 1933). Thereafter, reference is made to the various affidavits submitted by officials of the Authority and the city, by various expert road construction engineers and real estate experts for the Authority and by a real estate expert, the chairman of the City Central Planning Board, the traffic engineer of the Department of Public Safety, and the chief engineer of the city.
These affidavits in their essence present a contrariety of opinion as to whether dirt fill is standard construction, advisable and satisfactory for turnpikes, and particularly this turnpike, and as to whether the Raymond Boulevard interchange is necessary. The chairman of the Authority, its chief engineer, and independent consulting engineers of wide *529 experience in the field of highway construction, all express the opinion that dirt fill represents proper, advisable and more aesthetic construction for this roadway; that it represents a saving of almost $11,000,000 over steel; that an estimated 33,000 tons of scarce steel would be required to meet plaintiff's construction demand; that construction similar to that proposed by the Authority was used in other well-known highways; and that traffic conditions in Newark, as part of the metropolitan area, with its proximity to New York, require the two interchanges.
These affidavits further assert that there will be little disturbance of existing streets. Wilson and Allegheny Avenues will be preserved by bridges over them. The same is true of Delancey Street, now a paper street. Only two streets now in use will be closed. They are: (1) Hyatt Avenue, a short dead-end street, which runs from Wilson Avenue for a short distance past the new turnpike, and (2) Rutherford Street, which the map shows is to be partially relocated in a manner which does not seem likely to cause serious inconvenience.
The affidavits of the traffic engineer and the chief engineer of Newark, on the other hand, assert that "it is my experience and considered opinion in this matter that the proper construction as to type for the proposed toll highway through Newark is one of overhead steel or reinforced concrete." The reasons advanced are that "planned" streets would be "barred by a dirt fill structure," the use of the present streets could be more conveniently arranged by use of "an overhead highway of steel or reinforced concrete, the steel structure would lessen the taking of land, and that dirt fill would tend to impair the future development of the area through which the roadway would pass.
These affidavits further recite that the present traffic needs of Newark do not require such a turnpike nor do they warrant the construction of an interchange at Raymond Boulevard. The opinion is expressed that the "proper point of entry and exit" is at Port Street and that the interchange at Raymond Boulevard is "unnecessary and unreasonably *530 planned." No traffic statistics are furnished nor are any facts recited to support the view concerning the lack of need for the Raymond Boulevard interchange, nor for the view that only one should be built and that one at Port Street.
In an action of this nature, the existence of a contrariety of opinion or of a factual dispute of the character shown here, is not the determining factor on a motion for summary judgment. The question is: Do the affidavits and exhibits show a contrariety of opinion or definite facts such as would create an issue on which a finding might be made that the Authority was guilty of a palpable abuse of discretion. In my judgment, no such genuine issue exists here either by virtue of the plaintiff's pleadings, affidavits and exhibits alone, or because of any conflict with those of the defendants (Rule 3:56-3).
If differences of opinion such as those presented, no matter with what good faith they were offered, are to be regarded as a basis for a trial on the issue of manifest abuse of authority, the court would have virtual veto power over this legislative agency. Such power does not exist; it is neither desired nor desirable. The limit of the jurisdiction of the court is in the field of manifest abuse by the Authority of its legislatively delegated power. The court cannot become a road builder; it cannot substitute its judgment for that of the Authority.
There being no genuine factual issue on the subject of palpable abuse of authority, the motion for summary judgment must be granted, unless the contention is sound that the enactment creating the Turnpike Authority is unconstitutional or that the action of the Authority is invalid for any of the reasons advanced.

II.

ASSERTED INVALIDITY OF THE TAKING OF EXISTING AND POTENTIAL PUBLIC STREETS OF THE CITY OF NEWARK
The city claims that the taking of existing and paper publicly-owned streets, without its consent, is invalid because *531 contrary to R.S. 40:67-1, as amended, and contrary to section 14 of the Turnpike Authority Act.
R.S. 40:67-1, as amended, confers upon municipalities the authority to enact ordinances dealing with the ascertainment and establishment of the boundaries of all streets and highways within their confines and regulating the use of such streets and highways generally.
Section 14 of the Turnpike Act provides:
"All * * * cities * * * and other political subdivisions and all * * * agencies * * * of the State of New Jersey * * * are * * * empowered to lease, lend, grant or convey to the Authority at its request upon such terms and conditions as the proper authorities of such * * * political subdivisions * * * (or) agencies * * * of the State may deem reasonable and fair and without the necessity for any advertisement, order of court or other action or formality, other than the regular and formal action of the authorities concerned, any real property which may be necessary * * * to the effectuation of the authorized purposes of the Authority, including public roads and other real property already devoted to public use."
The argument of the invalidity of the taking of Newark's public streets without its consent, is constructed on a base of the cited sections of the two statutes in combination with and interpretation by plaintiff of a portion of the opinion of the Supreme Court in New Jersey Turnpike Authority v. Parsons, 3 N.J. 235, 249 (1949).
In this case the Supreme Court, among other things, discussed section 5(j) of the Turnpike Authority Act (N.J.S.A. 27:23-5), which confers upon the Authority the right to acquire for the turnpike project by eminent domain any necessary land, "including public lands * * * highways or parkways, owned by or in which any county, city, borough, town, township, village, or other political subdivision of the State of New Jersey has any right, title or interest * * *." In considering whether this section conferred the right to acquire public lands of the State of New Jersey by eminent domain, the court said:
*532 "Reading the provisions of these two sections together, we do not construe Section 5 (j) as granting any power of general condemnation of property owned or held by the State. In the light of the detailed directions for the acquisition of state property by lease, loan, grant or conveyance contained in section 14 and the absence of a clear and unambiguous grant of authority to the Turnpike Authority to take state property by condemnation, we cannot properly infer the existence of the power of eminent domain as to state property in the Turnpike Authority."
So the city maintains that since section 14 permits the acquisition of public lands of a municipality under the same conditions, the exercise of the right of eminent domain against it is likewise not maintainable. The situations are not at all similar. The court was dealing only with the question of whether an agency or a creature of the State should be recognized as having the right by condemnation to take away land owned by the State itself and already devoted to public use. And it declared that such an anomalous situation should be recognized only where the enabling legislation showed a crystal-clear intention to grant such power.
However, no such basic problem exists in the case of a municipality. Here there can be no doubt that the Authority, as a creature of the State, with a legislative mandate to construct this turnpike and with only a simple and unadorned power of eminent domain, could acquire the lands of a subordinate branch of the government by this means. If this were not so, and the consent of the municipality was necessary for the acquisition of its lands, then the municipality would hold veto power and the part would rule the whole. Plainly the Legislature intended that any possible conflict in this field should be resolved in favor of the Authority. (Sec. 21).
In any event, there is a "clear and unambiguous grant" of such authority so far as municipalities are concerned. Section 5 (j) specifically prescribes that public lands or highways owned by any city may be so acquired.
The intention of the Legislature in the application of section 14 to municipalities is evident. The section was designed to encourage the acquisition of municipal lands by *533 agreement where possible and to facilitate such acquisition by requiring only a minimum of formalistic procedure. What other implication can flow from the words sanctioning consummation of the transaction "notwithstanding any contrary provision of law" and "without the necessity for any advertisement, order of the court or other action or formality?"

III.

CHARGE OF FAILURE TO GRANT A HEARING TO THE CITY ON THE METHOD OF CONSTRUCTION AND RAYMOND BOULEVARD INTERCHANGE
The city asserts that it made known to the Authority, prior to the letting of the construction contracts, its opposition to the dirt fill construction and to the Raymond Boulevard interchange. And it claims that its demand for a full hearing on the matter was not complied with. Therefore it urges that the action of the Authority in executing the contracts and going ahead with the work is illegal.
The affidavits indicate that on November 11, 1949, the city appointed a committee to represent it and to study the project. On December 6, 1949, the committee attended a public hearing conducted by the Authority at the Essex County Hall of Records. The typewritten record thereof, which was submitted by the city on this motion, consists of 21 large pages and contains an explanation by Authority officials of the project as it was planned through Newark, as well as comments and questions by a number of persons present representing the county, the city and the Public Service Company. In this connection, it is interesting to note that Newark's chief engineer, L. Dudley Coles, commented on the two proposed interchanges as follows:
"The two interchanges, one at Port Street, and one at Raymond Boulevard, seem to be sufficient and I have no doubt that they are closer than any other turnpike has interchanges, because I have *534 ridden the Pennsylvania Turnpike several times and I wondered whether my car would go the 18 or 30 miles between interchanges without service."
On August 10, 1950, another public hearing was held at the commission conference room at the City Hall, Newark. Counsel for the city submitted the stenographic transcript thereof, consisting of 177 typewritten pages. The conference was attended by three of the city commissioners of Newark and a number of other officials. My examination of this record shows that every phase of the argument presented in this action was thoroughly presented there on behalf of the city. At the conclusion of the meeting, the representatives of the Authority agreed to give further consideration to the plaintiff's opposition.
The affidavits set forth that the Authority did consider the problems raised, and consulted with and obtained further reports from its engineers with respect to them. And it is further asserted therein that the members of the Authority unanimously agreed to proceed with their plans.
While some of the statements made in these affidavits are in dispute, it is difficult to understand how it can be argued successfully that the city was not granted a hearing. The record is plainly to the contrary.
In connection with the claim of right to hearing, it seems necessary to express a further conclusion with respect thereto. There is no provision in this legislation which requires that a public hearing be given to a municipality or to a private individual on the problems of the method of construction or the property to be taken or the course to be followed by the roadway. These matters are committed to the informed judgment, experience and discretion of the Authority, and the only limitation imposed by the courts is that there be no palpable abuse of this power. Therefore whether public hearings or conferences are to be held on such subjects, is a matter of policy for the Authority with which the court cannot be concerned. (Nichols on Eminent Domain (3rd ed. 1950), vol. I, pp. 376, 377-380).
*535 Of course, a private citizen or a municipality is entitled to be paid just compensation for any property taken to construct the turnpike. And the courts are always ready to assure a full and fair hearing to that end.

IV.

CHANGE OF UNCONSTITUTIONALITY OF ACT FOR FAILURE TO CONTAINS STANDARDS AND TO IMPOSE SOME LIMITATION ON THE POWER OF EMINENT DOMAIN
Plaintiff contends that the act is void because the Legislature failed to set forth any standards to be followed by the Authority in selecting the course of the turnpike, the amount of property to be taken, its cost, the kind of highway it should be with respect to width, etc. In support of the position, reliance is placed on state by Van Riper v. Traffic Telephone Workers Federation of New Jersey, 2 N.J. 335, at p. 352 et seq. (1949). There the court said:
"While there is no doubt that the Legislature may delegate to an administrative body the exercise of a limited portion of its legislative power with respect to some specific subject matter, such delegation of legislative power must always prescribe the standards that are to govern the administrative agency in the exercise of the power thus delegated to it." (p. 353.)
Within the limits reasonably open to it in the matter of creating and authorizing an agency to construct a highway project, the Legislature has complied with this constitutional prohibition against unlimited delegation of its power.
In section 1 of the act, the character and purposes or the project are set forth. They are to provide for "the construction of modern express highways embodying every known safety device including center divisions, ample shoulder widths, long-sight distances, multiple lanes in each direction and grade separations at all intersections." It is provided that the credit of the State is not to be pledged by the Authority *536 (sec. 2); the issuance and nature of the bonds to finance the project are regulated (secs. 2, 7, 8, 9, 10, and 11); the words "project" and "turnpike project" are defined; the general and incidental powers of the Authority are prescribed (secs. 5, 6), procedure under which the exercise of the right of eminent domain may be exercised is specified (sec. 5(j)). It is given the right to enter upon any lands for purposes connected with the project, but it must make reimbursement for any damage done (sec. 6). Tolls and revenues are regulated (sec. 9) and the turnpike is required to be kept in good condition (sec. 14). So far as eminent domain is concerned, the authority given is to acquire thereby any land "which it may determine is reasonably necessary for any turnpike project" (sec. 5 (j)). Finally, the Legislature specified the point of origin and terminus of this particular project.
In my judgment, it would not be feasible to require more certain standards than those now prescribed. If it were necessary for the Authority to formulate specific plans as to the course of the turnpike through the various municipalities, and as to the manner and method of construction and then seek legislative approval thereof, there would be no purpose in creating the Authority; the Legislature might just as well act itself in the entire matter. The prohibition against abdication of legislative power in favor of an agency was never intended to extend to such administrative details.

* * * * * * *
Any other grounds urged in opposition to the motion are without substance or relevancy.
For all of the foregoing reasons, the defendants' motion for summary judgment will be granted.