SHELL OIL COMPANY, A CORPORATION OF THE STATE OF DELAWARE, PLAINTIFF-RESPONDENT, AND TOWN OF MORRISTOWN, A MUNICIPAL CORPORATION, INTERVENOR PLAINTIFF-RESPONDENT, v. BOARD OF ADJUSTMENT OF THE TOWNSHIP OF HANOVER, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued September 24, 1962—Decided November 5, 1962.

*Mr. Harry L. Sears* argued the cause for defendants-appellants (*Messrs. Young & Sears,* attorneys; *Mr. Harry L. Sears,* of counsel, *Mr. William P. Westling,* on the brief).

*Mr. Edward L. C. Vogt* argued the cause for plaintiff-respondent (*Messrs. Schenck, Smith & King,* attorneys, *Mr. E. Marco Stirone,* attorney for intervenor plaintiff-respondent, *Mr. Edward L. C. Vogt,* of counsel; *Mr. Garret A. Hobart, IV,* and *Mr. E. Marco Stirone,* on the brief).

The opinion of the court was delivered by

HANEMAN, J. The Town of Morristown (Morristown), pursuant to *R. S.* 40:8–1, *et seq.,* maintains and operates an airport on some 235 acres of land situate within the corporate limits of the Township of Hanover (Hanover). The airport is located in the southwesterly corner of Hanover at the Florham Park-Morristown lines and is bounded on its southerly side for approximately one-third of a mile by Columbia Road (also known as South Orange Avenue), a two-lane highway in 1958 (now a four-lane highway), connecting Florham Park with Morristown and points east. A 22 foot wide private access road running into the airport proper, known as Airport Road, intersects Columbia Road midway in this frontage. Columbia Road is also intersected approximately 300 feet west of the westerly airport property line and in the direction of Morristown by Park Avenue, a two-lane through highway running in a northerly-southerly direction. In 1956 Hanover adopted a revised zoning ordinance classifying the lands along the northerly and southerly sides of Columbia Road, and for some distance along Park Avenue north and south of Columbia Road, as an Office Building and Research Laboratory district (Office Zone). The airport frontage was so classified to a depth of 150 feet. Subsequent to the trial herein, the Office Zone on the airport property was increased to 400 feet in depth. The balance of said airport lands was placed in a Residential AA Zone.

In December 1958, Morristown leased a tract of land to Shell Oil Company (Shell) for the purpose of erecting a

gasoline service station. This land was bounded on two sides by the northerly line of Columbia Road and the easterly line of Airport Road and of the approximate dimensions of 200 feet in frontage by 150 feet in depth. Shell's application to the Hanover Building Inspector for a building permit was denied. Shell thereupon applied to the Hanover Board of Adjustment for a variance. The Board of Adjustment denied the application on the grounds that, (1) the zoning ordinance specifically prohibited Shell's proposed use in the Office Zone, and (2) neither hardship nor special reasons had been demonstrated. Shell then commenced an action in lieu of prerogative writs, joining the Board of Adjustment and the Building Inspector, wherein it sought a reversal of the action of the Board of Adjustment and a direction to the Building Inspector to issue the building permit. Subsequent to the filing of answers, Morristown intervened, and having joined Hanover as a defendant, sought by way of additional relief a judgment declaring that the ordinance was invalid and unenforceable insofar as Morristown particularly was concerned because of the immunity granted by *R. S.* 40:8-1, and, generally, because the creation of the Office Zone was an arbitrary, capricious and unreasonable exercise of the zoning power. Hanover filed an answer. A trial ensued. The trial court found and entered judgment for defendants. The plaintiffs appealed to the Appellate Division.

The arguments before the Appellate Division were directed solely to the alleged immunity of Morristown and the unlawful exercise of the zoning power. The contest of the action of the Board of Adjustment apparently was abandoned. The Appellate Division reversed the judgment of the trial court and having decided favorably for the plaintiffs upon the immunity issue in the following language:

"We find the use here proposed by plaintiffs to be a proper accessory to an airport, appropriate for the present and reasonably prospective needs of the airport * * *,"

did not pass upon the reasonableness of the zoning ordinance. See 71 *N. J. Super.* 532. Defendants petitioned this court for certification which we granted. 37 *N. J.* 134. The arguments here as well as before the Appellate Division are restricted to the relief sought by Morristown and we shall therefore limit our consideration accordingly.

## I.

Plaintiffs argue first, that the airport lands, an exclave of Morristown, are immune from any zoning control by Hanover through the instrumentality of the specific provisions of *R. S.* 40:8–1. The solution of this problem, therefore, requires a construction of that statute which, so far as here pertinent, reads:

*R. S.* 40:8–1.

"The governing body of any county and the governing body of any municipality, or either of them, may acquire by gift, grant, purchase, condemnation or in any other lawful manner real estate or any right or interest therein *for airport purposes* and so use lands theretofore acquired for other public purposes and being used for airport purposes and *erect thereon and maintain buildings for the airport purposes* * * *."

*N. J. S. A.* 40:8–2.

"The governing body of any municipality may acquire, establish, construct, own. control, lease, equip, improve, maintain, operate and regulate airports or landing fields *for the use of airplanes and other aircraft within or without the limits of such municipality and may use for such purpose or purposes* any property, owned or controlled by such municipality, suitable therefor."

*R. S.* 40:8–4.

"Any real estate acquired, owned, controlled or occupied by such municipality *for the purposes enumerated in section* 40:8–2 *of this title* shall be acquired, owned, controlled and occupied for a public purpose and as a matter of public necessity, and such municipality may acquire property for such purpose or purposes under the power of eminent domain as and for a public necessity." (Emphasis supplied.)

Plaintiffs rely heavily upon the construction of the subject statute in *Aviation Services v. Board of Adjustment of Hanover Tp.*, 20 *N. J.* 275 (1956). The question there was whether the plaintiff which operated an aircraft maintenance service and flight school at the Morristown Airport could reconstruct and enlarge a building it had leased from Morristown. The airport was then included within a Residence B Zone by Hanover. The court concluded that *R. S.* 40:8–1 *et seq.* bestowed upon Morristown an immunity from the zoning power of Hanover. It is to be noted, however, that the factual complex in *Aviation Services* concerned a use clearly related to and in furtherance of the primary purpose to which the statute applied, *i.e.*, the maintenance and operation of an airport. A warning, however, that the power of the parent municipality was not without limit was given in these words:

"Our holding in this case is not to be considered as giving judicial recognition or impetus to a program of wholesale aggrandizement of territory. The authority bestowed upon municipalities to establish and maintain public airport facilities must be reasonably exercised in response to the public need, both present and that fairly to be anticipated. While this court would not condone arbitrary action in the establishment or operation of airport facilities within the domain of another governing power, it is incumbent upon us to lend a liberal construction to the airport legislation, *R. S.* 40:8–1 *et seq.*, *N. J. S. A.* to insure the benefits which were intended to flow to municipalities having the foresight to maintain these facilities. *Art.* IV, *Sec.* VII, *par.* 11, *Constitution* of 1947. * * *" 20 *N. J.*, at *pp.* 285, 286.

Similar *caveat* was given by the Appellate Division in the present matter. 71 *N. J. Super.*, at *p.* 537. Although Justice Burling concluded in *Aviation Services* that the statute speaks in "broad terms," this designation was related directly to a use in furtherance of or accessorial to airport purposes.

■ The problem with which we are concerned is one which arose infrequently until relatively recent times. See *New Jersey Interstate Bridge & Tunnel Comm. v. Jersey City*, 93 *N. J. Eq.* 550 (*Ch.* 1922); *Tim v. Long Branch*, 135 *N. J. L.* 549 (*E. & A.* 1947); *City of Newark v. New*

*Jersey Turnpike Authority,* 12 *N. J. Super.* 523 (*Ch. Div.*
1951), aff'd 7 *N. J.* 377 (1951); *The Port of New York
Authority v. Weehawken Tp.,* 14 *N. J.* 570 (1954); *Washington Township, in Bergen County v. Ridgewood Village,*
26 *N. J.* 578 (1958). This is attributable to the creation of
enclaves for the execution of various specific purposes, which
enclaves are not under the jurisdiction of the municipalities
within whose boundaries the lands are located. Each case
must be considered on its own particular facts, controlled by
the particular language of the creative statute. A consideration of the opinions treating of this subject evokes the conclusion that the test to be applied to a land use in order to
ascertain whether it qualifies for an immunity from local
zoning regulations is whether it is reasonably accessorial or
incidental to the primary purpose sought to be advanced by
the creation of the separate authority. Thus, in *Hill v.
Borough of Collingswood,* 9 *N. J.* 369 (1952), the court held
that the leasing of a club house and tennis courts of the
Camden County Park Commission to a private individual
and the operation therein of a milk bar, was in furtherance
of "facilities for the enjoyment of the dedicated use, and
wholly in keeping with its character." Again, in *Town of
Bloomfield v. New Jersey Highway Authority,* 18 *N. J.* 237
(1955), which involved the construction of restaurants and
gasoline service areas along the Garden State Parkway, the
court pointed out, at *p.* 245:

"The operation of the 165-mile limited access highway itself, as a
revenue-financed facility, is admittedly a proper governmental function and merely incidental thereto are the various subordinate operations (including the service area) which are appropriate and necessary for the satisfactory fulfillment of the social objectives. In its
brief, the Town concedes that 'restaurants and filling stations' may
well be necessary for the running of modern lengthy express highways
and the fact seems to be that nowhere in the United States are such
highways now being built or planned without them. *Cf. Public
Authorities in the States* 86 (1953). It matters not whether these
subordinate operations, considered alone, cross the shadowy line between governmental and proprietary functions for, in either event,
they constitute a proper public use."

■ An examination of the statute forces the conclusion that it intended an exemption only as to such uses as are in fact accessorial and incidental to the primary purposes of airport operation. The express provisions that the municipality may acquire land "for airport purposes" (*R. S.* 40:8–1), "for the use of airplanes and other aircraft within or without the limits of such municipality and may use for such purpose or purposes any property" (*N. J. S. A.* 40:8–2), and the other portions of the statute italicized above, clearly demonstrate that the immunity granted is so limited.

So here, we must consider the facts adduced at the trial in the light of the above statutory construction and judicially established standard. Robert P. McGovern, manager of the airport, testified that it was intended to employ all of the airport lands facing Columbia Avenue for a "commerce development." A man prepared for the Airport Commission manifests this frontage as platted into seven lots which bear the legend, "Area Reserved for Commercial Development." He considered that, "any airport of any magnitude is a community in itself and each service has a bearing on the other." In answer to a question as to why he had not attempted to obtain a gasoline station earlier, he replied:

"Well, Mr. Vogt, I might put it this way: that was why I was employed there in the first place in July 1957. I was employed because up until that time there hasn't been anyone who could give his time to securing business which would make *the airport more self-sustaining.*" (Emphasis supplied.)

On cross-examination the following appears:

"Q. A gasoline station represents, then, your first step towards this further commercial development of the airport property? A. I consider it a step.

Q. What would be the next logical use after the gasoline station, assuming that you got that? A. The next logical step is to secure *any business which would be an asset* to the Morristown Airport in its continued operation.

Q. Exactly in what way would it have to have an impact on your airport operation to be an asset? A. *So that the funds derived from*

*the rental of the land for whatever use it might be used* in the continued operation of the airport.

Q. Would it be fair for me to interpret that statement by suggesting that you consider these commercial type uses important because they make money for the Town of Morristown so that it can further develop the airport facility? A. *The revenues derived from these uses,* not so much as to continue to develop, as to continue to safely operate the airport.

Q. The moneys that you would derive then, for example, from the gasoline station would be put toward the continued maintenance of the airport? A. That's correct." (Emphasis supplied.)

Again:

"Q. What other kind of businesses have you discussed with particular or potential operators for this area? A. Well, we have talked with people who wanted *to put fabricating plants* in there; we have talked with people who wanted to *put golf ranges* in; as I say, food; of course, hangar business, I think I mentioned that before; *various little plants.* Somebody wanted to put a commercial parking lot in there and run a shuttle bus to Morristown.

Q. The fabricating plant and the golf course, did you enter into any actual negotiations with these people? A. No, sir. The minute that the man mentioned a fabricating plant, I didn't feel it was conducive to the well being of the airport and the entire community." (Emphasis supplied.)

Stephen Sussna, plaintiff's planning expert, opined:

"A. Well, it can be a start of a *commercial section* within the airport *to foster aeronautical development for the bulk or the remainder of the property.* It can be, to use a crude illustration, possibly an effective tail, wagging and helping the dog or stimulating the dog. It can help. After all, *the airport isn't a profit making thing;* it is a public use type of thing and whatever profits or earnings would be derived would, I imagine, of necessity have to be plowed back toward the aeronautical development of the airport. That's how I view it.

Q. Do you also view this gasoline station as a part of the development of the airport as a unit? A. I view it that it can be part of an integrated plan and there has been thinking; and I have checked this out, there has been thinking about a unified attempt, dividing different sections of the airport for different uses; *one particular use more or less carrying on its shoulder other airport development.* Yes, it can be part of an integrated whole." (Emphasis supplied.)

McGovern also testified that there was a need for a gasoline service station because of about one hundred persons regularly employed at the airport as well as the influx of 3,000 to 4,000 visitors over weekends. He stated that "a great many people * * * run out of gas on the airport." On the other hand, the proof evidenced that there are a group of four gasoline service stations on Columbia Road two and two-tenths miles east and two service stations two miles west of Airport Road. It is to be noted that plaintiffs' witness, Barbanes, when asserting the necessity for a gasoline station on Columbia Road, recited the distances between the service stations on that highway available to the travelling public and did not advert to any need arising from airport customers.

Though access may be had to the service station from within the airport *via* Airport Road, the location of the service station buildings facing Columbia Road demonstrates that the business's major attention is addressed to the highway traffic or general public rather than to those who use the airport facilities.

The conclusion is unavoidable that the establishment of a gasoline service station at this location was not stimulated because it was necessary for the primary purpose of the airport nor even incidentally necessary for that purpose, but rather was prompted as a revenue-producing measure.

■■ The most favorable view of plaintiffs' proposed use is that it may be convenient for some airport customers but is not incidental to or necessary for the maintenance and operation of the airport. We find that the operation of a gasoline station at this location does not bear such a relation to airport purposes as would bring it within the aegis of statutory immunity. The land is subject to the zoning power of Hanover except insofar as it is used for airport purposes or a purpose accessorial or incidental thereto. The use here proposed not being within that exemption, the zoning ordinance controls. The Appellate Division erred in finding to the contrary.

## II.

The remaining question is whether the creation of the Office Zone amounted to an arbitrary, capricious or unreasonable exercise of the zoning power.

■ A zoning ordinance is presumed reasonable, valid and constitutional and that presumption subsists until the ordinance is shown to be arbitrary, unreasonable or capricious. The burden of rebutting this presumption and establishing such arbitrariness, unreasonableness or capriciousness is imposed upon him who asserts it. *Jones v. Zoning Board of Adjustment, Long Beach Tp.,* 32 *N. J. Super.* 397, 405 (*App. Div.* 1954); *Esso Standard Oil Co. v. Town of Westfield,* 33 *N. J. Super.* 324, 331 (*App. Div.* 1954); *Hochberg v. Borough of Freehold,* 40 *N. J. Super.* 276, 290 (*App. Div.*) certif. denied 22 *N. J.* 223 (1956); *S. & L. Associates, Inc. v. Washington Twp.,* 61 *N. J. Super.* 312, 322 (*App. Div.* 1960), modified, 35 *N. J.* 230 (1961).

■ An examination of the record leads us to the conclusion that plaintiffs failed to sustain this burden.

Reversed and remanded for entry of judgment for defendants.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.