IN THE MATTER OF FORMAL COMPLAINT OF PUBLIC SERVICE COORDINATED TRANSPORT, A CORPORATION, PETITIONER-RESPONDENT, v. SUPER SERVICE BUS CO., ALLEGING ILLEGAL OPERATION OF AUTOBUSES, RESPONDENT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 23, 1963—Decided February 14, 1964.

Before Judges GAULKIN, SULLIVAN and LEWIS.

*Mr. LeRoy Danziger* of the New York Bar argued the cause for Super Service Bus Co. (*Messrs. Pincus, Shamy & Sheehan,* attorneys).

*Mr. Thomas J. McCluskey* argued the cause for Public Service Coordinated Transport (*Mr. Francis J. Murphy,* on the brief; *Mr. Richard Fryling,* attorney).

*Mr. Richard F. Green,* Deputy Attorney General, appeared for the Board of Public Utility Commissioners (*Mr. Arthur J. Sills,* Attorney General, attorney).

The opinion of the court was delivered by

GAULKIN, S. J. A. D. The Board of Public Utility Commissioners (hereafter P.U.C.) ordered Super Service Bus Co. (hereafter Super) to "cease and desist" from continuing the

bus operation hereafter described because Super had not obtained municipal consents in accordance with *N. J. S. A.* 48:4–3, a prerequisite to P.U.C. approval under *R. S.* 48:2–14. Super appeals, claiming the operation is exempted from the operation of that section of the law.

*N. J. S. A.* 48:4–3 expressly provides that it shall not be applicable "to a charter bus operation or a special bus operation." *N. J. S. A.* 48:4–1 defines "charter bus operation" as follows:

"The term 'charter bus operation' as used in this chapter means and includes the operation of an autobus or autobusses by the person owning or leasing such bus or busses pursuant to a contract, agreement or arrangement to furnish an autobus or autobusses and a driver or drivers thereof to a person, group of persons or organization (corporate or otherwise) for a trip designated by such person, group of persons or organization for a fixed charge per trip, per autobus or per mile."

Super claims its operation is a "charter bus operation" within this definition.

There is no substantial dispute as to the facts. Super's brief states them as follows:

"One Donald Tierney on behalf of a group consisting of 86 persons calling themselves the Madison Park Commuters Association negotiated a contract with appellant whereby it chartered two autobusses per day to the Association to transport its members from Madison Township, N. J. and from East Brunswick, N. J. to the Jersey Central Ferry, Jersey City, N. J. One made two stops in Madison Township where members were picked up and the other bus picked up members at one location in Madison Township, a gas station in East Brunswick and the entrance to the New Jersey Turnpike also in East Brunswick. They returned via the same route. No schedules were published. The members were discharged at the Jersey Central Ferry. No passengers were picked up or discharged along the route. The busses left in the early morning and returned in the late afternoon. They made one round trip each.

"One bus carried 41 and the other 45 passengers at a fixed charge respectively of $46 and $51.75 per round trip. No individual fares were charged or collected and no tickets were sold. Appellant did not fix the price to be paid by any individual member. As representative of the group, Mr. Tierney collected the monthly dues in cash or checks on or about the first of each month and turned the total over to appellant. As a convenience to himself and to avoid unnecessary bookkeeping, Mr. Tierney requested the members paying by check to make them payable directly to appellant.

"The fixed charge per round trip was paid to appellant whether one or forty-five passengers traveled on any particular day. If a member was sick or went on vacation for as many as three weeks his seat was left vacant and the full fixed charge per bus per round trip was paid to appellant. There were no refunds. The only manner in which a new member was added to the roster of the Association was upon the permanent retirement of an existing member.

"At the time of the hearing the Association was not incorporated, had no officers and held no regular meetings. However, Mr. Tierney testified he met with the members every morning. If there were any complaints they were made to him and he, in turn, discussed them with appellant. Since the hearing the Association was incorporated. This, together with other facts, would have been introduced in evidence had the motion for further hearing been granted.

"In March 1961, Mr. Tierney inserted an advertisement in two local papers to the effect that a daily chartered bus was available for commuters to downtown New York. This advertisement was paid for by him and he was not reimbursed therefor by appellant or anyone else. The purpose of the advertisement was to obtain a waiting list to cover substitutes for possible retiring members. At the time there were no openings for new members.

"At all times the basis of appellant's charges was on a fixed price, per day, per trip, and per capita charges were never discussed."

Super's argument may be summarized as follows: (1) If the arrangement between it and Tierney had been for a single round trip, there could have been no question but that it would have been an excepted "charter bus operation." (2) It makes no difference that the arrangement was for round trips daily, five times a week, to continue indefinitely. We agree with (1), but not with (2).

Super contends that the definition of "charter bus operation" in *N. J. S. A.* 48:4–1 is so clear and unambiguous, and so plainly covers Super's operation, that we have no choice but to so hold. However, we find the language not to be so compelling. Indeed, we construe the language otherwise.

██ In construing a statute, we seek the intent of the Legislature. Of course, we must find that intent in the statute, but its words are not always to be read literally. We must interpret a statute as judges, not as grammarians or lexicographers. As Justice Frankfurter said in *Commissioner of Internal Revenue v. Acker,* 361 *U. S.* 87, 95, 80 *Sup. Ct.* 144, 4 *L. Ed. 2d* 127, 133 (1959), "The Court's task is to construe not English but congressional English. Our problem is not what do ordinary English words mean, but what did Congress mean them to mean."

██ When more than one construction is possible, it is not the words of the law, but the internal sense of it that makes the law. Such a statute should be considered in the context of its socio-economic setting. The intention of the Legislature emerges from the spirit and policy of the statute rather than from the literal meaning of particular terms. *Caputo v. The Best Foods, Inc.,* 17 *N. J.* 259, 264 (1955). In *L. P. Marron & Co. v. Township of Mahwah,* 39 *N. J.* 74, 80 (1963), the court said:

"* * * As stated in *Sperry and Hutchinson Co. v. Margetts,* 15 *N. J.* 203 (1954), at *p.* 209:

"The intention of the lawgiver is taken or presumed according to what is consonant to reason and good discretion. The particular words are to be made responsive to the reason and spirit of the enactment. *Wright v. Vogt,* 7 *N. J.* 1 (1951). The purpose of construction is to bring the operation of the statute within the apparent

intention of the Legislature. *Nagy v. Ford Motor Co.*, 6 *N. J.* 341 (1951). When the general intent is found, general words may be restrained accordingly, and those of narrower significance expanded to effectuate that intent. *Glick v. Trustees of Free Public Library*, 2 *N. J.* 579 (1949). The true meaning of any clause or provision ordinarily is that which best comports with the subject and general object of the act. *Maritime Petroleum Corporation v. City of Jersey City*, 1 *N. J.* 287 (1949).' "

■ Therefore, when one section of a statutory scheme of regulation is to be construed, it is reasonable to assume that the Legislature intended to advance the statutory scheme, and not to retard it, and the particular section should be so interpreted.

It appears to us that the construction advanced by Super is inconsistent with the spirit and intent of our laws relating to the control and regulation of public transportation, and might seriously affect the statutory scheme.

As long ago as 1930 it was settled "that the Legislature intended a comprehensive scheme whereby the transportation of passengers by auto buses should be brought under state control * * *." *Whitehead v. Board of Public Utility Commrs.*, 107 *N. J. L.* 41, 43 (*Sup. Ct.* 1930), *aff'd* 108 *N. J. L.* 258 (*E. & A.* 1931). Therefore, an operation should not be deemed excepted from the "comprehensive scheme" unless the statute plainly says so.

The basic philosophy of the statutory scheme is that the P.U.C. should see to it that the public's transportation needs be served with comfort, convenience, safety and economy. To that end the P.U.C. is empowered to license bus lines and to regulate their fares, routes, timetables, stops, etc.; and the P.U.C. is directed to stop unauthorized operations. *N. J. S. A.* 48:4–11.

■ Against this background we turn to the language of *N. J. S. A.* 48:4–1. It defines a "charter bus operation" as "the operation of an autobus" in the fashion described in said section "for a trip." Petitioner argues that this definition does not include the hiring of a bus or busses for daily trips over the same fixed route at the same fixed time; that such

an operation (especially when it is to continue indefinitely into the future) is no longer a "charter bus operation" but a regular transportation service which must be licensed like any common carrier. We agree.

Super argues that the words "for a fixed charge per trip, per auto bus or per mile" indicate that *N. J. S. A.* 48:4–1 does contemplate a single contract for the leasing of busses for more than one trip. That may be so, but not if the contract is for the same trip, between fixed termini, at fixed hours, daily, five days a week, and to continue indefinitely in the future or for so many times that the trips become, to all intents and purposes, a regular service.

The very section upon which Super relies shows clearly that the Legislature intended that an operation such as we have here was to be considered a "regular service," for *N. J. S. A.* 48:4–1(a) exempts taxicabs from chapter 4, but not if "such service becomes or is held out to be regular service between stated termini." Note also that *N. J. S. A.* 48:4–1(d) exempts certain intracity busses, which run over a fixed route on a regular schedule, but only if they carry no more than ten passengers. It seems to us most unlikely that the Legislature would forbid a "regular service" by a taxicab which carries very few passengers, or by an intracity bus carrying no more than ten passengers, and yet permit busses carrying 45 passengers to operate a regular service without P.U.C. approval or control. See also *N. J. S. A.* 48:4–9 which forbids even "special or occasional trips" in competition with licensed bus routes.

For the foregoing reasons we hold that the P.U.C. correctly construed the statute. Its order is affirmed.