55 N.J. 551 (1970)
264 A.2d 43
IN THE MATTER OF THE PETITION OF ASBURY-RED BANK LIMOUSINE SERVICE FOR APPROVAL OF MUNICIPAL CONSENTS FOR THE OPERATION OF A NEW LIMOUSINE ROUTE BETWEEN NEWARK AIRPORT AND POINTS IN MONMOUTH COUNTY AND MIDDLESEX COUNTY. ASBURY-RED BANK LIMOUSINE SERVICE, PETITIONER-RESPONDENT, AND PUBLIC SERVICE COORDINATED TRANSPORT, RESPONDENT-APPELLANT, AND CITY OF NEWARK, RESPONDENT-RESPONDENT, AND THE PORT OF NEW YORK AUTHORITY, INTERVENOR-RESPONDENT.
The Supreme Court of New Jersey.
Argued January 19, 1970.
Decided April 20, 1970.
*552 Mr. Thomas J. McCluskey argued the cause for respondent-Appellant Public Service Coordinated Transport (Mr. Richard Fryling, attorney).
Mr. Sam Weiss, Assistant Corporation Counsel, argued the cause for respondent-respondent City of Newark (Mr. Philip E. Gordon, Corporation Counsel, attorney).
Mr. Anthony D. Andora argued the cause for petitioner-respondent Asbury-Red Bank Limousine Service (Messrs. Andora, Baron & Palmisano, attorneys; Mr. Leopold A. Monaco and Mr. Michael R. DeCotius, on the brief).
Mr. Francis A. Mulhern argued the cause for intervenor-respondent The Port of New York Authority (Mr. Sidney Goldstein, General Counsel to The Port of New York Authority, of counsel; Mr. Hugh H. Welsh, on the brief).
Mr. William Gural argued the cause for respondent Board of Public Utility Commissioners (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by JACOBS, J.
In March 1968 the petitioner Asbury-Red Bank Limousine Service filed a petition before the Department of Public Utilities seeking permission to operate its limousine service between the Port of New York Authority's Newark Air Terminal and various points in Middlesex and Monmouth Counties. Though the petitioner had applied as early as 1966 to the City of Newark for its consent (N.J.S.A. 48:4-3; 48:4-10), the City inexplicably never acted on the application; however most of the municipalities along the petitioner's route, including all of the municipalities in Middlesex and Monmouth Counties where any stops would be made, had given their consents. No stops for either pickups or discharges would be made in Newark (except within the *553 Port Authority's Terminal) or in any other municipality outside of Middlesex and Monmouth Counties.
After preliminary procedures which do not concern us, and after due hearing, the Board of Public Utility Commissioners rendered its decision dated May 1, 1969. It explicitly found that "the operation of limousines as requested in the petition to and from Newark Airport from points in Monmouth and Middlesex Counties is necessary and proper for the public convenience and properly conserves the public interest. * * *" N.J.S.A. 48:2-14; 48:4-1 et seq.; In re Greenville Bus Co., 17 N.J. 131, 135 (1954); In re Public Serv. Coord. Transp. v. Super Serv. Bus Co., 82 N.J. Super. 371, 376 (App. Div.), certif. denied, 42 N.J. 143 (1964). This finding is amply supported by the record and no one before us attacks it. The Board also approved the municipal consents which the petitioner had obtained (N.J.S.A. 48:4-3) and granted permission to the petitioner to run through any municipalities along the route which had failed to grant consents. N.J.S.A. 48:4-10. Insofar as Newark was concerned, the Board held that "the municipal consent of the City of Newark was not required for limousine operations to and from Newark Airport so long as no stops were made in Newark proper."
The Public Service Coordinated Transport, which had appeared before the Board in opposition to the petition, filed a notice of appeal to the Appellate Division. The City of Newark, which had also appeared before the Board in opposition, took no appeal (cf. In re Old Colony Coal Co., 49 N.J. Super. 117, 129 (App. Div. 1958); Rundale v. Hill, 90 N.J. Eq. 262, 264 (E. & A. 1918)) but filed a brief supporting Public Service's sole contention that the petitioner could not, without Newark's consent, operate through Newark from the Port Authority's Terminal to points in Middlesex and Monmouth Counties. We certified the appeal of Public Service before argument in the Appellate Division and, though technical questions have been raised as to the standing of Public Service and Newark to prosecute *554 the appeal, we shall pass them by. See Elizabeth Federal Savings & Loan Assn. v. Howell, 24 N.J. 488, 499-504 (1957); In re Petition of Public Service Coordinated Transport, 103 N.J. Super. 505, 509 (App. Div. 1968).
In L. 1916, c. 136 the Legislature directed that auto buses for hire shall not be operated without consents from the cities whose streets they traverse. In L. 1926, c. 144 the Legislature amended its earlier enactment to set up what the court, in Whitehead v. Public Utility Commrs., 107 N.J.L. 41, 43 (Sup. Ct. 1930), aff'd, 108 N.J.L. 258 (E. & A. 1931), described as "a comprehensive scheme whereby the transportation of passengers by autobusses should be brought under state control * * *." See also In re Public Serv. Coord. Transp. v. Super Serv. Bus Co., supra, 82 N.J. Super. at 376; Doskovitch v. Bd. of Pub. Utility Commrs., 103 N.J.L. 570 (Sup. Ct. 1927); L. 1946, c. 131; N.J.S.A. 48:4-3. The amendatory legislation contemplated that auto bus owners would obtain not only municipal consents but also approval from the Board of Public Utility Commissioners (Whitehead, supra, 107 N.J.L. at 43; see L. 1921, c. 149; L. 1926, c. 146; N.J.S.A. 48:2-14; 48:4-1 et seq.); however, it expressly stipulated that whenever the auto bus route extends through more than two municipalities and one or more have given consent with Board approval but other municipalities along the route have refused consent, the Board may permit the auto bus to run through such refusing municipalities, provided "that no passengers be either taken on or discharged from said auto bus anywhere within the boundaries of the municipality or municipalities so refusing or failing to grant such consent * * *." L. 1926, c. 144 at 222; N.J.S.A. 48:4-10.
The legislative considerations and objectives underlying this so-called closed door proviso were quite evident. Buses simply passing through a community present factors which differ little from those pertaining to through traffic generally. Here the Legislature considered that the public interest *555 in having convenient and really accessible bus routes outweighed the interests of the municipalities through which the buses passed and that the sole approval of the Utility Commissioners would suffice to protect the public. However, where the buses stop to pick up or discharge local passengers, there are very special local safety and traffic factors of high concern to the officials affirmatively charged with the local responsibilities in these areas. Here, but only here, did the Legislature consider that the public interest required dual approval by the municipalities and the Utility Commissioners. N.J.S.A. 48:4-10; cf. Whitehead v. Public Utility Commrs., supra, 107 N.J.L. at 43-44.
In the light of the foregoing, the controlling issue before us is whether the Legislature contemplated, particularly in its later Air Terminal Statute which underlies the Port of New York Authority's operation of the Newark Air Terminal (L. 1947, c. 43; N.J.S.A. 32:1-35.1 et seq.; Newark v. Essex County Board of Taxation, 54 N.J. 171, 177-80 (1969)), that in addition to the approval from the Utility Commissioners which is not here in question (cf. N.J.S.A. 32:1-9; 48:4-1 et seq.), approval would also be required from Newark even though the buses would operate strictly from within the Air Terminal itself and would merely pass through Newark without any pickups or discharges. In seeking to carry out the legislative contemplation, primary reliance is properly placed not on "literalisms, technisms or the so-called formal rules of interpretation" but rather on "the breadth of the objectives of the legislation and the commonsense of the situation." Jersey City Chapt. Prop. Owners Protective Assoc. v. City Council of Jersey City, 55 N.J. 86, 100 (1969).
The terms of the Air Terminal Statute (L. 1947, c. 43) and the 1947 agreement between Newark and the Port Authority with respect to the operation of the Air Terminal, point strongly towards the denial of any municipal veto power such as that sought to be exercised by Newark here. *556 Section 1 of the Statute authorizes the Port Authority to operate air terminals as therein defined and authorizes municipalities to cooperate with the Authority. N.J.S.A. 32:1-35.1. Section 3 defines air terminals to include facilities "necessary, convenient or desirable" for the accommodation, use or convenience of passengers. N.J.S.A. 32:1-35.3. Section 10 first provides that the Authority may make application for federal aid; it then sets forth provisions which may fairly be viewed as independent of the subject of federal aid and as pertinent here. It provides (as amended by L. 1948, c. 214 at 1041) that the details of the operation of air terminals shall be within the "sole discretion" of the Authority and that "[t]he local laws, resolutions, ordinances, rules and regulations of a municipality within which an air terminal is situated shall apply to such air terminal, if so provided in any agreement between the Port Authority and such municipality, and to the extent provided in such agreement." N.J.S.A. 32:1-35.10.
The agreement between Newark and the Port Authority sets forth that the Authority shall operate the Air Terminal and provide "appropriate and needed facilities"; the Authority has the responsibility for maintaining all of the highways within the Terminal and also has the responsibility for snow and ice removal; and the Authority has undertaken to provide "police for patrolling, for guarding and for traffic control * * *." The agreement explicitly provides that Newark will have no responsibility for maintaining police or fire personnel in the Terminal although it will respond to calls from the Authority in the event of "crime, rioting, disasters and other emergencies * * *." The Authority has undertaken to provide suitable liability insurance and to hold Newark harmless from any claims for personal injuries suffered by persons within the Air Terminal and has agreed to abide by Newark's health, fire and building codes to the extent that the Authority "finds it practicable so to do" without interfering with the efficiency of its Air Terminal operations. And finally the agreement *557 provides that, except as expressly set forth otherwise, the Authority shall have full power to operate and maintain the Air Terminal and to enter into such arrangements with respect to it "as it may deem necessary and desirable." As between Newark and the Authority, the agreement leaves little room to doubt that the Authority has been vested with exclusive control, at least over all matters relating to transportation facilities and operations within the Terminal such as those sought to be conducted by the petitioner. See N.J.S.A. 32:1-154.1 et seq.; State v. Daquino, 56 N.J. Super. 230 (App. Div.), certif. denied, 30 N.J. 603 (1959), cert. denied, 361 U.S. 944, 80 S.Ct. 407, 4 L.Ed.2d 363 (1960); cf. Kozman v. Trans World Airlines, 236 F.2d 527, 532-33 (2 Cir.), cert. denied, Allied Cleaning Contractors, Inc. v. Allied Maintenance Corp., 352 U.S. 953, 77 S.Ct. 327, 1 L.Ed.2d 243 (1956); but cf. Silverman v. Wallander, 194 Misc. 532, 87 N.Y.S.2d 151, 152 (Sup. Ct. 1949).
In comparable areas, our courts have frequently found legislative intent freeing autonomous State agencies from the local controls of municipalities. See Town of Bloomfield v. New Jersey Highway Authority, 18 N.J. 237, 241-42 (1955); City of Newark v. New Jersey Turnpike Authority, 12 N.J. Super. 523 (Ch. Div.), aff'd, 7 N.J. 377, appeal dismissed, 342 U.S. 874, 72 S.Ct. 168, 96 L.Ed. 657 (1951); cf. Aviation Services v. Bd. of Adjustment of Hanover Tp., 20 N.J. 275, 282-83 (1956); Shell Oil Co. v. Bd. of Adjustment of Hanover Tp., 38 N.J. 403, 408-09 (1962). In Bloomfield, supra, the New Jersey Highway Authority was held not subject to local zoning and building requirements in its construction of the Garden State Parkway (18 N.J. at 249); and in City of Newark, supra, the New Jersey Turnpike Authority was held to have power to condemn municipal land needed in the construction of the Turnpike (12 N.J. Super. at 532) and to have powers analogous to municipal powers with broad discretion as to their exercise (7 N.J. at 381). In Shell Oil, supra, the *558 Court described the Garden State Parkway and the Turnpike as enclaves which "are not under the jurisdiction of the municipalities within whose boundaries the lands are located." 38 N.J. at 409. Similarly here the Port Authority's Air Terminal, though geographically within the municipal boundaries of Newark, may for present purposes be viewed as an enclave outside Newark within the legislative contemplation. Thus viewed Newark may readily be treated simply as a nonconsenting municipality along the route between the Air Terminal at one end and the Middlesex and Monmouth County municipalities at the other end; as such it may commonsensibly and soundly be brought within the terms of N.J.S.A. 48:4-10.
All that we have said leads firmly and justly to the sustaining of the Board's action below. That action clearly favored the public and was entirely compatible with existing legislation. Newark has no real interest exceeding that of the other municipalities through which the buses will travel. There will be no stops for passengers in Newark and the local officials will not be concerned with any special safety or traffic factors beyond those applicable to through traffic generally. The convenience of air travel would manifestly be disserved by affording to Newark the veto power it asserts but which lacks legislative support on a fair reading of the various statutory enactments in the related fields. See Hill v. Borough of Collingswood, 9 N.J. 369, 375 (1952).
Affirmed.
For affirmance  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN  7.
For reversal  None.