THOMAS J. WHELAN, MAYOR OF THE CITY OF JERSEY CITY, SUBSTITUTED PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, AND LEO A. McCARTHY, PLAIN-TIFF-INTERVENOR-APPELLANT, v. NEW JERSEY POWER & LIGHT COMPANY, AND JERSEY CENTRAL POWER & LIGHT COMPANY, ETC., DEFENDANTS-AP-PELLANTS AND CROSS-RESPONDENTS, AND WATER POLICY AND SUPPLY COUNCIL, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued March 30, 1965—Decided June 28, 1965.

---

238

239

240

Mr. *I. Charles Lifland* argued the cause for appellant and cross-respondent Whelan (*Mr. Meyer Pesin,* attorney).

Mr. *Alfred A. Rochester* argued the cause for appellants and cross-respondents New Jersey Power & Light Co. and Jersey Central Power & Light Co.

Mr. *Philip M. Law, Jr.,* of the New York and Illinois bars, argued the cause for intervenor-appellant (*Mr. Leo A. Mc-*

*Carthy,* attorney *pro se; Messrs. Reed, Hoyt, Washburn & McCarthy,* of the New York bar, of counsel).

Mr. *William Miller* argued the cause as *amicus curiae.*

Mr. *Alan B. Handler,* First Assistant Attorney General, filed a statement in lieu of brief (Mr. *Arthur J. Sills,* Attorney General of New Jersey, attorney for Water Policy and Supply Council and *pro se*).

The opinion of the court was delivered by

WEINTRAUB, C. J. This case involves the validity of a contract dated December 4, 1958 made by the City of Jersey City with New Jersey Power & Light Company and later assigned by the utility to a related company, Jersey Central Power & Light Company (both herein called the Company), whereby the City would acquire additional water supply and the Company would acquire hydroelectric power. The issues raised are (1) whether the contract is prohibited by the constitutional ban against donation by a municipality of its property and the loan of its credit; (2) whether the Legislature has authorized a contract for the coordinated activities here contemplated and whether certain provisions of the contract violate affirmative statutory restrictions; and (3) whether the contract conflicts with the covenant in outstanding water bonds relating to the fixing of water rates or rentals.

Upon cross-motions for summary judgment the trial court found the contract invalid. We certified the ensuing appeals before the Appellate Division heard them.

I.

■ We must first refer to an issue we raised, *i. e.,* whether the proceedings are truly adversary. Both the City and the Company ask that the contract be upheld. In essence the Mayor is troubled by doubts entertained by the City's bond counsel. Further, purchasers of the bonds to be issued for the

project will require the approving opinion of bond counsel, and bond counsel are unwilling to risk one. Hence this litigation.

To establish an adverse position, a member of the firm of bond counsel purchased $5,000 of outstanding water bonds and with that "interest" in hand intervened as a party plaintiff. It seems clear to us that the intervenor has conflicting interests by reason of which his presence in the cause cannot supply a true contest. He and his partners have to lose if he wins and so also will their client, the City. We appreciate that the motivation was good and that the intervenor made full disclosure. We acknowledge too that the intervenor and his law firm presented their opposition forcefully. Still it is unwise for counsel to be so situated.

Nonetheless we are satisfied that relief should be granted under the Uniform Declaratory Judgments Act, *N. J. S.* 2A:16–50 *et seq.* The purpose of the act is "to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." *N. J. S.* 2A:16–51. It specifically authorizes an action by a person interested under a "written contract" to "have determined any question of construction or validity arising under" the contract. *N. J. S.* 2A:16–53. The City and the Company are parties to a contract, and the Mayor and the Company seek a declaration of its validity. Although both parties believe the contract is valid and seek a judgment to that effect, the controversy is real and not hypothetical, for the views expressed by bond counsel led a responsible official of the municipality to doubt whether he can lawfully carry out the agreement and whether bonds to be issued to that end can be marketed. See *Abbott v. Beth Israel Cemetery Ass'n of Woodbridge,* 13 *N. J.* 528, 541 (1953).

The problem resides not in a lack of the required uncertainty with respect to contractual rights but rather in the circumstance that when litigants seek the same result, a court cannot approach its task confident of the aid which truly adversary positions will ordinarily generate. Relief has been

denied in bond-issue cases where the litigants sought the same result. See *Borchard, Declaratory Judgments* (2d ed. 1941), pp. 511–512; cf. *New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235, 240 (1949). Yet, an issue may not be hypothetical or moot or a judgment merely advisory on that account. In the case at hand, existing contractual claims will be concluded by the judgment, and an important public project will founder or proceed, depending upon the resolution of questions raised. In these circumstances relief should not be denied because the parties hope for the same answer. Rather the Court should take such steps as will assure it that all recesses of the problem will be earnestly explored. To that end we required the services of an *amicus curiae* at the expense of the City.

## II.

The constitutional issue revolves about *Art.* VIII, § III, ¶¶ 2 and 3 of the State Constitution which read:

"No county, city, borough, town, township or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of, any stock or bonds of any association or corporation."

"No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever."

The City's money is not given, nor is its credit directly loaned to the Company, but it is contended the transaction involves a partnership or joint venture which this provision of the Constitution was intended to bar.

The facts are these. The City owns and operates a water supply system which it decided to augment. It proposed to construct a reservoir upon the Rockaway River. There were a number of objectors, including the Company, which advanced a proposal under which the City would obtain a larger supply of water at a lower unit cost, the Company would generate hydroelectric power, and the impact upon the locality would

be minimized. That plan was ultimately approved by the Water Policy and Supply Council, and the contract was made to implement it.

The plan calls for the construction by the City of two reservoirs with connecting waterway facilities. One reservoir will be located on the river; the other will be off-site and at a higher elevation. The Company is to erect, own and operate a pumping and hydroelectric generating plant. Water will be pumped by the Company from the lower reservoir to the upper one for storage. So much as is released from the upper reservoir for hydroelectric power will pass through the hydro-electric plant to the lower reservoir, and thereafter will be returned to the upper reservoir. Reversible pump-turbine facilities will thereby generate additional power during the daily peak-demand period and thereafter return the water to the upper reservoir through the use of surplus power steam-generated during the daily off-peak periods. No water is consumed in the process, and under the plan the water needs of the City will always prevail over the needs of the Company. These summarized findings of the Water Policy and Supply Council are not challenged:

"The operations of the hydro-electric plant will not interfere with water supply operations. The dual project will be beneficial in the public interest and superior to the original project through reduction in costs to Jersey City, creation of added storage capacity, use of lands less desirable for other purposes, addition of substantial tax ratables which will more than off-set those lost to Jefferson Township by dislocation of residents within reservoir areas, elimination of necessity for acquisition of existing recreational area around Longwood Lake, as contemplated in original application, and through additional power to meet peak loads in an area of increasing demand for electricity."

The City will be the sole owner of the reservoirs and the waterway facilities and the Company will be the sole owner of the hydroelectric plant. The City will issue general obligation bonds to finance its costs. The Company will pay the City stipulated sums annually from which the City will recapture part of its capital costs and obtain a return for the use of the

water we have already described. These payments start at about $500,000 and will level off at $145,000 a year in the 48th year.

The City will convey five acres of land for the power plant site immediately above the lower reservoir, and the Company agrees to pay for it "at the average rate per acre fixed as the current market value for similar adjoining lands proposed to be acquired by the City for the Lower Reservoir." The City agrees also to grant a right of way for electric transmission and distribution lines and communication facilities extending from the Company's hydroelectric station.

The contract will continue so long as the facilities are used for public potable water supply. The Company is assured certain protective rights or options depending upon whether the discontinuance of this potable water supply should occur less or more than 100 years hence.

No one suggests the arrangement was intended to benefit the Company at public expense. The City and the Company struck an arm's length bargain from which each will gather certain benefits sufficient to make the deal attractive. In short, no donative intent is claimed. Nonetheless, it is argued the constitutional provisions quoted above stand in the way of this transaction, however advantageous it may be to the municipality.

The history of these constitutional provisions is well known. They, as well as a companion provision applicable to the State alone, *Art.* VIII, § II, ¶ 1, were added by amendment in 1875 to the *Constitution of* 1844 as a reaction to the widespread practice of donating property and lending credit to aid the railroad industry in its infancy. *Roe v. Kervick*, 42 *N. J.* 191, 206 (1964). Such assistance had been thought to be in the public interest because of a general gain to the over-all economy expected to flow from the new mode of transportation.

These amendments were not intended to bar the State or its agencies from discharging their public duties through the medium of contracts with private entrepreneurs. No doubt the amendments of 1875 are hard-pressed today as

government is called upon to subsidize privately owned operations which cannot exist unaided and which, if they fail, will leave a void which under present-day concepts of its obligation to the people government itself will have to fill. But the amendments must be applied according to their essence, understood in the light of the evil that led to their adoption. Hence, although they do prohibit the donation of public property and the lending of public credit where the sole public gain is at best but secondary to and derivative from the success of the entrepreneur who is aided, yet if government decides there is a need which it should meet in the interest of its citizens, the amendments do not deny government the power to meet those needs through contracts with private companies merely because the companies are attracted by the prospect of profit.

We recently canvassed this area in *Roe v. Kervick, supra* (42 *N. J.* 191). There we sustained a statute under which the Legislature, recognizing a public duty to relieve the poor, undertook to meet that duty under a program whereby the Federal Government, the State and the municipality loaned moneys to finance redevelopment projects, privately owned and operated for private profit, which would provide job opportunities in economically distressed areas. The public purpose being to deal with poverty, we accepted the legislative decision that its program was a suitable and desirable approach to the problem.

The case at hand actually presents none of the difficulties discussed in *Roe v. Kervick*, for here the municipality entered into a bargain solely for its own dollar profit. It decided it would accomplish more and at a lesser unit cost if it so arranged its project that a public utility could simultaneously advance its separate interests. In other words, we do not have the classic situation of public money or credit funneled into private hands to enable the private operator to supply something the public needs. The City's motivation is confined to its own water business; it has no interest in meeting the electric power needs of the area.

■ The intervenor nonetheless contends the constitutional provisions forbid a "union" of public and private properties. He refers to *Alter v. City of Cincinnali*, 56 *Ohio St.* 47, 46 *N. E.* 69 (*Sup. Ct.* 1897), which involved an arrangement under which a city would own part of the waterworks and a private company would own the balance. The hypothesis apparently was that the total works would be inoperable unless the city succeeded in negotiating a lease and thus there "would be a joining of two properties, owned by different parties, together to make one property, the parts owned by each being necessary to the successful operation of the whole and each owner having his say as to the terms and conditions upon which the whole shall be operated." (46 *N. E.* 69, at *p.* 71.) The court found the constitutional ban ran against a sharing either in the title to property or in the power to manage it.

There are some cases which bar a so-called partnership or joint venture by government and private interests in the ownership or operation of a project. See 37 *Am. Jur., Municipal Corporations* § 135, *p.* 751; 15 *McQuillin, Municipal Corporations* (*3d ed.* 1950) § 39.30, *p.* 92. Such cases seemingly mean that, however public the purpose and however defensible the use of public funds to achieve it through arrangements with private sources, still the arrangement may not take the form of a partnership or joint enterprise involving either a sharing of the underlying ownership or a sharing in the operating experience.

It is not immediately clear why this limitation should be found if the public expenditure does not otherwise offend the constitutional ban against the use of property or credit. Our Constitution does not say its prohibitions shall depend upon the form a transaction takes. Sundry arrangements have been made between public and private interests to achieve the desired result. See *Simon v. O'Toole*, 108 *N. J. L.* 32 (*Sup. Ct.* 1932), affirmed 108 *N. J. L.* 549 (*E. & A.* 1932); *Redfern v. Jersey City*, 137 *N. J. L.* 356 (*E. & A.* 1948); *Wilson v. Long Branch*, 27 *N. J.* 360 (1958), *cert.* denied 358 *U. S.*

873, 3 *L. Ed. 2d* 104 (1960); *Roe v. Kervick, supra* (42 *N. J.* 191); see also *Jamouneau v. Local Government Board,* 6 *N. J.* 281 (1951), and *East Orange v. Board of Water Commissioners,* 41 *N. J.* 6 (1963).

In any event we need not explore the view of these constitutional provisions taken in *Alter* since the case before us does not involve it. There is no joint ownership; the City owns the reservoirs and the waterway facilities, while the Company owns the hydroelectric plant. As to operations, the Company agrees to keep the waterway facilities in good repair and the City and the Company have stated roles with respect to the release of water by the one and the pumping of the water by the other, but the obligations of both are already explicit and the City's operation of its waterworks does not depend upon negotiations yet to take place. Further, as we have already noted, the City's water needs will always prevail, and if the spectre of the Company's abandonment of its hydroelectric plant should be thought to be relevant, the short answer is that the City could provide for pumps and the power to operate them. The use of pumps to send water to storage reservoirs at a higher elevation is an established technique, and hence it would be unrealistic to find a constitutional barrier in the possibility that the Company may default in its obligation. Nor is there a "partnership" between the City and the Company whereby they will share in gains and losses or in which it can be said in that sense that the City's property or credit is employed to aid another. The City and the Company do not thus participate in the experience of the other; each is engaged on its own in separate business.

### III.

Next it is urged that even if the Constitution does not bar the transaction before us, still the Legislature has not empowered the City to enter into it. Further, it is charged the contract violates certain statutory restrictions to which we will refer hereinafter.

## A.

The argument in support of the claim of lack of statutory authorization is cast in terms we have already found to be inapt, *i. e.*, that the City has formed a partnership or joint enterprise with the Company under which the two share common control of the waterworks with the capacity in the Company to defeat the City's realization of its plan for additional water supply. As we have already said, the City is the sole owner of the reservoirs and waterway facilities, holding a paramount claim to the impounded water, while the Company is the sole owner of the hydroelectric plant.

*R. S.* 40 :62–47 authorizes a municipality to "enter into all agreements and contracts, and do all other acts necessary to provide water for the public and private uses of the municipality and its inhabitants in accordance with the provisions of sections 40 :62–48 to 40 :62–105 of this title." *R. S.* 40 :62–49g authorizes a municipality to construct dams, canals, aqueducts, reservoirs, "and all necessary pipe lines and other works." *R. S.* 40 :62–87 authorizes contracts "with any person to supply him with water for fire protection, manufacturing and irrigation and other special purposes, at rates and upon conditions to be designated by the governing body." *R. S.* 40 :62–89 empowers a municipality to acquire by purchase or condemnation property "necessary for the purpose of furnishing water power to drive and operate pumping stations, pumps and other machinery used in taking and storing water from streams and rivers * * * for the use of the municipality and of consumers, both within and without the municipality."

■■ These sections authorize the City to construct the plant and works required of it under the contract with the Company. So much of the agreement as will enable the Company to obtain hydroelectric power is a contract to supply water for "other special purposes" within *R. S.* 40 :62–87, quoted above. And *R. S.* 40 :62–89 is noted because it bears upon the City's authority to provide the necessary pumping

if the Company should at any time breach its contractual obligation to supply it.

It may well be that the Legislature did not have in mind the precise arrangement here involved. We gather that the reversible pump-turbine, which is the key to the arrangement, was developed after the enactment of the statute. Yet we ought not assume the Legislature intended its grant of power to be limited by the existing state of technology and thus to deny municipalities the opportunity to profit from developments. We are enjoined by the Constitution, *Art.* IV, § VII, ¶ 11, the Home Rule Act, *R. S.* 40:42–4, and the Optional Municipal Charter Law which applies to the City, *N. J. S. A.* 40:69A–30, to interpret statutes liberally in favor of the existence of local power to deal with local needs. Further, both the Home Rule Act, *R. S.* 40:48–2, and the Optional Municipal Charter Law, *N. J. S. A.* 40:69A–30, grant to local government broad general powers to meet such needs in addition to powers specifically enumerated. See *Wagner v. Mayor & Municipal Council of City of Newark,* 24 *N. J.* 467, 474–478 (1957). In the light of the cited provisions we are satisfied the City was authorized to make the contract.

## B.

This brings us to the question whether some of the terms of the contract violate specific statutory limitations.

The first statute referred to is *N. J. S. A.* 40:60–26 which deals with the sale by a municipality of lands not needed for public use. The first three subsections of the statute set forth procedures under which there will be bidding in one form or another. The remaining subsection permits a public or private sale subject to approval of the Division of Local Government.[1] It is contended the contract contemplates a violation of this statute with respect to the proposed sale of five acres for the site of the Company's hydroelectric plant

---

[1] This provision was found to be invalid because of a lack of standards in *Jamouneau v. Local Government Board,* 6 *N. J.* 281 (1951).

and also with respect to the easements or rights of way mentioned above.

It seems to us the statute does not apply. This statute, like other bidding statutes relating to the expenditure of public moneys or disposition of public property, is designed to obtain the best possible return for public moneys and property. *Skakel v. Township of North Bergen*, 37 *N. J.* 369, 378 (1962). Such statutes must be read in the light of the reason for their enactment, lest they be applied where they were not intended to operate and thus deny municipalities authority to deal with problems in a sensible, practical way. So, a competitive bidding statute has been held not to apply where from the nature of the work to be done or the items to be bought, competitive bidding would be impractical, see *A. C. Schultes & Sons v. Township of Haddon*, 8 *N. J.* 103 (1951) ; *Schwartz and Nagle Tires, Inc. v. Board of Chosen Freeholders*, 6 *N. J. Super.* 79, 82 (*App. Div.* 1949), certif. denied 4 *N. J.* 127 (1950) ; nor, for like reasons, to extra work required by unanticipated developments in the performance of a construction contract, *Home Owners Construction Co. v. Borough of Glen Rock*, 34 *N. J.* 305 (1961). So also a statute calling for competitive bidding on the leasing of municipal property was held not to deny the municipality the necessary right as an owner to specify uses for which the demised premises could be used even though the bidding might be curtailed on that account, nor to modify the terms of an existing lease where the municipality was motivated solely by its own interests, both holdings stemming from a conviction based upon business realities that the statute was not intended to restrain the municipality in these respects. *Greenberg v. Fornicola*, 37 *N. J.* 1 (1962).

In the case before us, the sale of five acres to be the site of the hydroelectric plant is a small, incidental aspect of the whole transaction. The Company must have the plant at the designated site in order to obtain the benefit of the contract and to discharge its obligations under it. The use of the site by someone else for some other purpose would be incompatible

with the project. It is therefore pointless to seek another prospect. The situation is beyond the reason for the statute and hence is not within it.

The provision for easements and rights of way is also merely incidental to the main object of the contract. Its validity need not be tested as a thing separate and apart. It is a necessary aspect of the basic arrangement, and if that arrangement is valid as we have found it to be, this provision must be sustained as something necessary to its fulfillment. We note that the easements in no way interfere with the City's control of the reservoirs and waterway facilities.

 It is also suggested that the sale of the five acres is unwarranted because the statute here under discussion speaks of the sale of lands "not needed for public use," whereas this parcel remains necessary for the public use. Again the sale must be viewed as a part of the whole transaction and in that context the lands are needed for the water supply system only insofar as the hydroelectric plant built thereon will yield power to return water to the upper reservoir, and to that extent the contract with the Company provides the required assurance. In other words, the statute was not intended to prevent a conveyance of publicly owned land when the conveyance is a necessary or appropriate incident of a public project.

 Nor do we find substance in the contention that the contract involves the use of the public power to condemn lands for the benefit of private interests. To begin with, we have no way of knowing that the acreage to be sold will have been acquired by the City by condemnation. At any rate, the transfer is part of the plan to achieve the public result and hence there is no perversion of power for purely private gain.

 The remaining statute allegedly infracted is *R. S.* 40:62–83 which authorizes contracts for "the sale and delivery of a supply of water" for a period not exceeding 25 years. The statute does not apply. It contemplates the sale and delivery for consumptive use whereas the transaction before us falls at best within *R. S.* 40:62–87 as a contract to supply

water for "special purposes," which section contains no time limitation.

## IV.

We come then to the final claim, that the contract violates the contractual rights of holders of outstanding general obligation water bonds. Those bonds contain a covenant that the City will "fix and collect rates, rentals or other charges for connection with and use of, and for water furnished by, the water supply system" sufficient to meet all expenses, principal and interest on all bonds and any other obligations having a lien on the revenues. It will be recalled the Company has agreed to pay annual sums, beginning at about $500,000 and leveling off at the constant figure of $145,000 per year in the 48th year. It is this agreement for a fixed annual charge which the intervenor says will breach the covenant.

We think the issue is insubstantial. For one thing, the covenant doubtless relates to charges for consumptive use of water, rather than the use of the water, without loss, to generate power. Further, the bonds contemplate that the system may be enlarged, and hence the covenant ought not to be construed to apply to the basic arrangement whereby the City and a power utility seek to advance their respective needs. Finally, there is nothing to indicate the total revenues will be inadequate at any time. We cannot say that the contract in question, assuming it comes within the covenant, will disable the City from obtaining revenues from all rates, rentals and charges sufficient to satisfy the covenant.

The judgment is accordingly reversed and the matter remanded to the Superior Court for the entry of judgment in accordance with this opinion.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For affirmance*—None.