114 N.J. Super. 94 (1971)
274 A.2d 849
SIDNEY L. BRODY, PLAINTIFF,
v.
CITY OF MILLVILLE, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided March 3, 1971.
*95 Mr. Anthony Buonadonna for plaintiff (Messrs. Tuso and Gruccio, attorneys).
Mr. Edward Miller for defendant City of Millville.
Mr. Bennett I. Bardfeld appeared for City of Vineland.
HORN, A.J.S.C.
By this action in lieu of prerogative writs plaintiff challenges the authority of the City of Millville (city, or Millville) to enter into certain leases and contracts with Airwork Service Division, a division of Pacific Airmotive *96 Corporation (Airwork) and to borrow money for the purpose of erecting buildings and facilities to lease to Airwork.
The parties stipulated that another issue regarding the tax status of the land and buildings so utilized by Airwork is under review by the Division of Tax Appeals. Consequently, this issue is excluded from consideration.
The events leading to this action commenced during World War II. As part of the war effort the Federal Government established within the corporate limits of Millville a military airport as a staging area for military aircraft. The facility, including runways and buildings, was of a size and capacity to accommodate aircraft larger and more numerous than ordinarily would be essential for a municipality the size and population of Millville and its environs.
Following the war the entire complex was ceded to the city, which has since operated same as a public utility. N.J.S.A. 40:8-2.1 Shortly thereafter a predecessor of the presently constituted Airwork entered into a lease with Millville whereby it occupied some of the buildings, runways and aprons in connection with its business of repairing and servicing aircraft motors. However, the unoccupied portions continued to be used as a municipal airport.
As Airwork's business expanded over the ensuing years many different leases were negotiated with the city to permit Airwork to utilize more of the available space. On July 3, 1962 all existing leases were consolidated into what is known as the "master lease." This instrument recognized that title to certain buildings previously constructed by Airwork was vested in Airwork and that title to certain others was vested in the city. It provided that ownership and title to all buildings would vest in the city at the termination of the lease on December 31, 1970. The instrument also fixed the rents to be paid by Airwork to the city. It recounted the obligations of each of the parties with respect to providing fire insurance so that all buildings were protected. Rent for buildings owned by the city was fixed at 25c per square foot. *97 Rent for buildings "owned" by Airwork was fixed at $1 per year.
On September 17, 1968 these parties executed another agreement providing for the construction by Airwork of a hangar, taxiway and apron on the facility. By its terms the city leased to Airwork the land on which the hangar was to be constructed as well as the land for the taxiway and apron for a term of 25 years upon the same terms and conditions as the 1962 lease, "except that there shall be no rent during said term." This document further provides that title to the building is to vest in the city at the expiration of said term and that at the expiration of said term "the parties agree to negotiate a new lease at a price to be then agreed upon but not to be in excess of a figure then calculated to be equivalent to 40c per square foot at the 1968 level."
On February 3, 1970 the city and Airwork entered into still another agreement whereby the former agreed to construct for the use of Airwork a hangar and an addition to a building already occupied by Airwork under lease with the city. This instrument further provided for the making of a lease for the hangar and addition for 20 years, subject to the applicable terms of the master lease at a rental of $1.70 per square foot and a further lease for same upon its termination for an additional term of not less than ten years at a rental to be negotiated. The city then adopted ordinance 3-1970 directing the issuance of bonds to raise funds for the improvements contemplated by this agreement.
Airwork uses the leased premises for repairing aircraft motors and engines which are brought to its plant at the airport by air and surface transportation. Admittedly its business is not confined to the repair of motors, which only incidentally require servicing when at the airport. In the future Airwork will probably expand its operations at the airport to include repairs to industrial engines which power generating systems.
The city maintains that it requires the additional revenue derived and which may be derived from the leases and contracts *98 with Airwork in order to alleviate the large drain upon its finances required to maintain the airport. Incidental, but by no means minor, benefits are derived from the employment furnished to its citizens by Airwork.
Plaintiff first advances the view that the proposed construction and associated bond issue are invalid because the proposed building is to be used under lease to Airwork for a private purpose instead of "airport purposes," as required by N.J.S.A. 40:8-1. This statute reads as follows:
The governing body of any county and the governing body of any municipality, or either of them, may acquire by gift, grant, purchase, condemnation or in any other lawful manner real estate or any right or interest therein for airport purposes and so use lands theretofore acquired for other public purposes and being used for airport purposes and erect thereon and maintain buildings for the airport purposes.
Upon such acquisition or use, the governing body of any county and the governing body of any municipality, or either of them, may lease the real estate, so acquired, with or without consideration to the state of New Jersey, or any agency thereof, or may lease it to any person for such consideration and for such term of years as may be agreed upon. [Emphasis added]
He asserts that renting the existing buildings and building the new structures for rental to Airwork constitute the ultra vires engagement by the city in private business.
I do not agree that this properly describes an activity proscribed by law. Rather the issue is simply whether the proposed action is authorized by law, either expressly or impliedly.
Although the language of N.J.S.A. 40:8-1 authorizes the erection of buildings for airport purposes, it does not delimit the construction of buildings for other purposes. I do not find that any statute of this State evinces a prohibition against such construction. Other statutes may be read in pari materia. Brewer v. Porch, 53 N.J. 167 (1969); City of Clifton v. Passaic County Board of Taxation, 28 N.J. 411 (1958); Palmer v. Kingsley, 27 N.J. 425 (1958).
*99 N.J.S.A. 40:60-42 authorizes municipalities to lease to any person any land or building not presently needed for public use. Its language is broad enough to authorize leases of less than the entire airport property for either airport or other purposes.
In Cordingley v. Borough of Mendham, 12 N.J. Misc. 331, 171 A. 158 (Sup. Ct. 1934) cited by our present Supreme Court in Schwartz v. Borough of Stockton, 32 N.J. 141 (1960), the court upheld the validity under this statute of the lease of a building by a borough to a lumber company. See also Camden Plaza Parking v. Camden, 16 N.J. 150 (1954); N.J.S.A. 40:28-3(b).
In our State, municipalities are endowed with powers expressly conferred as well as purposes necessarily or fairly implied in or incident to the powers expressly conferred. Camden Plaza Parking v. Camden, supra. Courts are enjoined to construe liberally, in favor of municipalities, laws concerning them. Bruno v. Long Branch, 21 N.J. 68, 71 (1956); N.J. Const. (1947) Art. IV, § VII, par. 11.
N.J.S.A. 40:28-3, which governs county airports, demonstrates that the Legislature intended to grant broad powers to counties in establishing and operating airports. No persuasive reason appears to indicate that it was intended to grant broader powers to counties in this area than to municipalities.
Plaintiff relies on the following cases in support of his position that the actions of the city are ultra vires: Shell Oil Co. v. Bd. of Adjustment, Hanover Tp., 38 N.J. 403 (1962); Borough of Moonachie v. Port of N.Y. Authority, 38 N.J. 414 (1962); Todd Shipyards Corp. v. Township of Weehawkin, 45 N.J. 336 (1965).
Shell Oil dealt with the question of whether the use of part of the airport property for a gasoline station was barred by the zoning regulations of the municipality in which the airport site lay. The court held that it was so barred because the proposed use was unrelated to "airport purposes." Justice Haneman said that "(t)he test to be applied to a *100 land use in order to ascertain whether it qualifies for an immunity from local zoning regulations is whether it is reasonably accessorial or incidental to the primary purpose sought to be advanced by the creation of the separate authority." At 38 N.J. 409. The site in question was so located as to cater to the traveling public in general; not specifically to those using the airport. Thus, the holding is not that the airport land could not be rented for a purpose foreign to airport purposes; but only that if part of the airport lands were leased for purposes unrelated thereto, the use must comply with the zoning requirements of the municipality having jurisdiction. Actually, this case supports the views of defendants because it recognizes that a portion of municipal airport property may be rented for a use unrelated to airport purposes and also because of its recognition of the right of a municipality to foster the development of a part of the airport lands for commercial purposes.
The question in Moonachie, supra, was whether the Borough of Moonachie had the right to tax land acquired by the Port of New York Authority lying within its borders, and a building constructed by the Authority specifically for a tenant whose use was totally unrelated to "airport terminal purposes." The court held that since the land was acquired and held for airport terminal purposes, it could not be taxed; but that the building which was unrelated to such purposes was taxable. No question was raised in the case with respect to the power of the Authority to lease the building for the purposes described in the lease.
Todd Shipyards, supra, does not support plaintiff's view. That case revolved about N.J.S.A. 54:4-2.3, which provides that when real estate is exempt from taxation and is leased to one whose real property is not so exempt, and the leasing does not make the real estate taxable, the leasehold estate shall be taxed as real estate to the lessee.
The attack upon the validity of the bond issue under ordinance 3-1970 rests upon two premises. The first is that since the city allegedly may not rent any portion of *101 the airport property for the private purposes of Airwork, the subordinate undertaking to make such lease is likewise invalid. Second, that Art. VIII, § III, pars. 2 and 3 of our 1947 Constitution prohibit this course of action by Millville.
Plaintiff does not contend that there is any other legal impediment to the issuance of the bonds and to build the structures, but only that since the purpose of building is ultra vires, the entire transaction is invalid.
The above constitutional paragraphs are as follows:
2. No county, city, borough, town, township or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of, any stock or bonds of any association or corporation.
3. No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever.
Roe v. Kervick, 42 N.J. 191 (1964), construed these provisions to hold that if public funds are used for beneficent public purposes, governmental in nature, albeit the recipients are private entities, the State constitution is not contravened. The mere fact that a private advantage may incidentally result does not affect the constitutional validity of the transaction. See Whelan v. N.J. Power & Light Co., 45 N.J. 237 (1965).
The reason why these sections were incorporated into our Constitution as amended in 1875 was because of a practice that had grown up very largely in the West in the furtherance of aid to railroads and other private corporations. But where municipalities obtain a benefit by such a transaction, the Constitution is not flouted. Carr v. Borough of Merchantville, 102 N.J.L. 553, 556 and 557 (Sup. Ct. 1926); Camden v. South Jersey Port Comm., 2 N.J. Super. 278 (Ch. Div. 1949), aff'd and mod. 4 N.J. 357 (1950). The constitutional restrictions "must be applied according to their essence, understood in the light of the evil that led to their *102 adoption." Whelan, supra, 45 N.J. at 247; 64 C.J.S. Municipal Corporations § 1870, at 429.
Whelan decided that a municipality could validly enter into a contract with a public utility electric company whereby the municipality would construct two reservoirs which would extend its water facilities and would provide the electric company with means of generating hydroelectric power through facilities to be constructed by the utility company under the contract. The Court said:
The City's motivation is confined to its own water business; it has no interest in meeting the electric power needs of the area.
The case at hand actually presents none of the difficulties discussed in Roe v. Kervick, for here the municipality entered into a bargain solely for its own dollar profit. It decided it would accomplish more at a lesser unit cost if it so arranged its project that a public utility could simultaneously advance its separate interests. [at 247].
Certainly the form that the transaction takes for the purpose of accomplishing the municipal benefit is not the criterion for determining the validity thereof.
In Roe v. Kervick, supra, the court sustained a statute under which the State and a municipality, in conjunction with the Federal Government loaned money to finance development projects, privately owned and operated for private profit, in order to provide job opportunities in economically distressed areas, saying:
The concept of public purpose is a broad one. Generally speaking, it connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare. [42 N.J. at 207]
See also Newark v. Essex County Board of Taxation, 54 N.J. 171, 187 (1969), cert. den. City of Newark v. Port of New *103 York Authority, 396 U.S. 987, 90 S.Ct. 483, 24 L.Ed.2d 452 (1969).
Very recently our Supreme Court again recognized that municipalities were properly concerned with the economic problems of its citizens and that action reasonably taken by them toward betterment, where tied to authorized projects, serve a public purpose for the general welfare of the city. Levin v. Township Committee, Bridgewater Tp., 57 N.J. 506 (1971).
In the case at bar it is conceded that there is ample statutory authority for the city to maintain an airport. There is no limitation on the size. The airport's facilities are presently greater than the population of the area requires. The size was the result of the fortuitous circumstances of its acquisition. The contracts heretofor made between Millville and Airwork, and those hereinafter contemplated, were and are primarily focused upon relieving the municipality of either raising by taxation substantial sums to meet the maintenance charges or reducing the size or surrendering the airport facility.
Reducing the size or surrendering the facility may carry with it unfavorable economic impact. The city is charged only with the exercise of its discretion in good faith. Plaintiff does not assert that the municipality has acted in bad faith. However, he claims that the city exercised poor judgment in connection with the consideration exacted from Airwork.
Although grossly insufficient consideration for a lease of municipal property may constitute a violation of the above constitutional prohibitions, East Orange v. Bd. of Water Com'rs, etc., 79 N.J. Super. 363 (App. Div. 1962), aff'd on other grounds 41 N.J. 6 (1963), plaintiff has not offered any proof by affidavit to support his contention. R. 4:46.
Jamouneau v. Local Government Board, 6 N.J. 281 (1951), does not militate against defendants. In that case there was nothing to be considered except the income or *104 monetary consideration. It did not involve, as here, the maintenance of an authorized municipal facility.
Finding as I do on this motion that the challenged actions of the city were and are valid, summary judgment will be entered in favor of the defendants.